This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2020 VT 69

No. 2019-049

| | |
|---|---|
| C. Paige Hinkson | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Lamoille Unit, |
| | Civil Division |
| | |
| Stuart Stevens | October Term, 2019 |

Megan J. Shafritz, J.

Andrew D. Manitsky and Barbara R. Blackman of Lynn, Lynn, Blackman & Manitsky, P.C., Burlington, for Plaintiff-Appellee.

Craig S. Nolan and Owen J. McClain of Sheehey Furlong & Behm P.C., Burlington, for Defendant-Appellant.

PRESENT: Reiber, C.J., Robinson and Eaton, JJ., and Skoglund, J. (Ret.) and Howard, Supr. J. (Ret.), Specially Assigned

¶ 1. **ROBINSON, J.** Defendant appeals a final stalking order requiring him to stay 300 feet away from plaintiff. He argues that his conduct of (1) calling plaintiff's cell phone repeatedly from a number with no caller ID, (2) sending three shipments of books addressed to her husband to the house she and her husband shared, including primarily books about rape, and (3) watching her in a coffee shop for an unspecified period of time, could not be considered stalking under the civil stalking statute, 12 V.S.A. § 5131. Construing the terms of § 5131 narrowly because it mirrors the criminal stalking statute, we conclude that defendant's conduct in this case does not rise to the level of stalking, and therefore reverse.

¶ 2.    On June 21, 2018, plaintiff filed a Complaint for Order Against Stalking against defendant under 12 V.S.A. § 5133.  The court granted a temporary protective order, which through numerous extensions remained in place until the two-day hearing on November 8 and 9.  The superior court found the following facts by a preponderance of the evidence.

¶ 3.    Plaintiff lives in Stowe, Vermont with her husband C.D. and their teenage daughter. Plaintiff and C.D. co-founded a business, Transegy, LLC, that provides leadership development and executive coaching.  Plaintiff's office is in her home, and her personal cell phone number is listed as the contact number for the business.  C.D. previously worked at a company called Inntopia.

¶ 4.    Defendant lives in Stowe, Vermont.  He is a writer, political strategist and media consultant who has a "reputation as an aggressive operator in his professional pursuits."  He is in a romantic relationship with L.S., who also lives in Stowe and has a teenage son who attends high school in the same class as plaintiff's daughter.

¶ 5.    In February 2017, plaintiff's husband C.D. had a sexual encounter with defendant's romantic partner L.S., who had been exploring potential employment opportunities with Inntopia. Whether this was a consensual encounter or an act of sexual assault is in dispute.  Shortly after the incident, L.S. reported to defendant that C.D. sexually assaulted her.  Defendant testified that it was "extraordinarily difficult" for him to see the pain L.S. was in.  He saw a therapist to help him understand the experiences of victims of sexual violence and read many books addressing the subject.  L.S. filed a sexual-harassment lawsuit against C.D. and Inntopia, which settled in May 2017.  As part of the settlement, L.S. signed a nondisclosure agreement.  Plaintiff was unaware of L.S.'s allegations and her husband's infidelity until the lawsuit settled.

¶ 6.    In April, before the settlement, plaintiff began receiving numerous calls from a number with no caller ID; the caller hung up if she answered the phone.  She installed a program on her cell phone that can "unmask" telephone calls.  The evidence at trial showed that between

2

April 2017 and March 2018, defendant called her cell phone twenty-six times from a masked number. Defendant also called C.D.'s cell phone repeatedly during this period. In total, he called or texted plaintiff's and C.D.'s cell phones a total of 151 times. Many of the phone calls took place in the evening, including calls after ten or eleven p.m. Defendant testified that he thought he was calling the Transegy business line, not a personal cell phone, and that he was trying to reach C.D. to tell him that defendant and L.S. were not involved in a new sexual-harassment claim being asserted against Inntopia and C.D. by another person. The court did not find this explanation to be credible.

¶ 7. In May 2017, plaintiff and C.D. hosted a pre-prom party for their daughter, their daughter's classmates, and the classmates' parents. Before learning of C.D.'s sexual encounter with L.S., plaintiff had invited L.S. to the party. After learning of the incident, plaintiff asked a mutual friend to tell L.S. not to attend. Defendant called C.D. regarding the party, and the two had a thirty-minute conversation that defendant described as "civil." Following the telephone conversation, defendant sent C.D. an email criticizing C.D.'s character, lack of honesty with his wife, and conduct with respect to L.S. He accused C.D. of "continuing to victimize an innocent woman and her child." Neither defendant nor L.S. attended the party.

¶ 8. In June 2017, defendant sent three shipments of books, addressed to C.D., to plaintiff and C.D.'s home address. The first shipment contained a book defendant had written about his father called The Last Season; Missoula: Rape and the Justice System in a College Town by Jon Krakauer; and I Never Called It Rape by Robin Warshaw. The second shipment contained Rape is Rape: How Denial, Distortion, and Victim Blaming Are Fueling a Hidden Acquaintance Rape Crisis by Jody Raphael and a note that read "Hi [C.D.], Enjoy your gift! From [defendant]." The third shipment contained Asking For It: The Alarming Rise of Rape Culture – and What We Can Do About It by Kate Harding. Plaintiff opened the packages and was disturbed and upset to receive books on the topic of rape and with the word prominently displayed on the covers.

3

Defendant testified that he sent the books because he thought they would be helpful to C.D., but the court did not find his explanation credible.

¶ 9. At some time during this period, plaintiff visited a coffee shop in Stowe to meet a friend who was running late. Plaintiff noticed defendant at the coffee shop with two to-go cups and a pastry bag. Rather than leaving, defendant remained in the store and sat two tables away, facing where she was sitting and staring at her. He did not drink the coffee or eat the food he had purchased. Plaintiff estimated that the encounter lasted for many minutes, presumably until her friend arrived.

¶ 10. Numerous articles were published about the sexual-assault allegations, including several by L.S. and defendant himself. In November 2017—when the masked calls to plaintiff's phone were at their peak—defendant emailed plaintiff an article he had written for the Stowe Reporter entitled "What To Do With Bad Men: Shun Them." The article was written in the wake of the #MeToo movement. Defendant wrote that he had "seen it in action recently where a man who prominently held himself out as a feminist and community leader has been quietly exposed as a serial assaulter of women." He argued:

> [W]hat is the right way to react to a man in the community whom you know has hurt women? . . .
>
> My view is that the answer is a simple one: Shun these men. Do not allow them to return to normalcy, which is the great sanctuary they seek. Sadly, many spouses are drawn into this deception, used to try to gain sympathy or proof the man must not be 'that bad.' This is the path Bill Cosby's wife has taken and it is not a rare one.

Shortly after the third party filed the other sexual harassment lawsuit against Inntopia and C.D., L.S. published an article on the Daily Beast website entitled, "The NDA [Non-Disclosure Agreement] Protected Our Predator. I'm Breaking My Silence, Because Women Deserve Better." The article discusses L.S.'s own lawsuit against C.D. and her support of the third party. Additional

4

articles about both lawsuits followed. The Stowe Reporter has also published several articles about this stalking action.

¶ 11. On June 12, 2018, defendant sent an email to B.A., a friend of plaintiff's family. The email questioned why B.A. continued to be friends with C.D. in light of the allegations against him. Defendant wrote that he was disappointed that B.A. was going to spend vacation time with C.D. over the summer. Defendant called C.D. a "master manipulator," a "pathological liar," and a "predator." B.A. forwarded the email to plaintiff and C.D. Plaintiff filed the stalking complaint on June 21, 2018, shortly after receiving the forwarded email.

¶ 12. Based on plaintiff's and B.A.'s testimony, as well as its own observations of plaintiff, the court found that "there can be little doubt as to the emotional distress experienced by [plaintiff]" as a result of defendant's conduct. Plaintiff told B.A. that she did not feel safe in her home and community, and she testified that she did not eat or sleep well and that her routines had changed. She was emotionally distressed during the hearing and exhibited symptoms of panic during her deposition after being led to believe that defendant had moved closer to her home.

¶ 13. The court found that defendant's behavior constituted stalking under 12 V.S.A. § 5131. Under this statute, stalking means:

> to engage purposefully in a course of conduct directed at a specific person that the person engaging in the conduct knows or should know would cause a reasonable person to:
> (A) fear for his or her safety or the safety of a family member; or
> (B) suffer substantial emotional distress as evidenced by:
> (i) a fear of unlawful sexual conduct, unlawful restraint, bodily injury, or death; or
> (ii) significant modifications in the person's actions or routines . . . .

Id. § 5131(6). A course of conduct means "two or more acts over a period of time, however short, in which a person follows, monitors, surveils, threatens, or makes threats about another person, or interferes with another person's property." Id. § 5131(1)(A).

5

¶ 14. The court found by a preponderance of the evidence that defendant engaged in a course of conduct directed at plaintiff by making numerous masked calls to her cell phone, sending multiple books on rape culture to plaintiff's home, and watching plaintiff for an extended period of time in the coffee shop. The court concluded that the masked calls and coffee-shop incident constituted "monitoring" under § 5131(1)(A). It also concluded that sending multiple books on rape to plaintiff's home was an "implicit threat of potential retribution or retaliation." The court found that plaintiff had experienced emotional distress and that "a savvy person with [defendant's] background and experience, who had endeavored to educate himself on what it must be like to be a woman who had been the victim of sexual assault," would have understood the potential impact of his actions. Based on these findings, in the context of all the evidence submitted, the court issued a six-month protective order requiring defendant to remain 300 feet away from plaintiff. See id. § 5133(d) (providing for orders against stalking or sexual assault upon finding that defendant stalked or sexually assaulted plaintiff).

¶ 15. We reverse. We conclude as a threshold issue that the case is not moot because stalking orders have negative collateral consequences that persist after the order has expired. On the merits, we conclude that the trial court's findings, and the underlying evidence, do not support a conclusion that defendant engaged in a "course of conduct," as that term is defined in the civil stalking statute.

I. Mootness

¶ 16. The threshold issue before us is whether the case is moot. The superior court's order was in effect until July 1, 2019. Plaintiff moved to extend the protective order for an additional two years, and the superior court denied the motion. In late July 2019, this Court issued an entry order requiring defendant to show cause why the appeal should not be dismissed. Defendant argues that the appeal meets the requirements for two exceptions to the mootness doctrine: "(1) the exception for cases that are capable of repetition yet evading review and (2) the

6

exception for negative collateral consequences." Paige v. State, 2017 VT 54, ¶ 10, 205 Vt. 287, 171 A.3d 1011 (citation omitted). We agree with defendant that the negative-collateral-consequences exception applies in this case.

¶ 17. "The general rule is that a case becomes moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." In re P.S., 167 Vt. 63, 67, 702 A.2d 98, 100 (1997). The case must remain live throughout all stages of review. Sullivan v. Menard, 2019 VT 76, ¶ 5, __ Vt. __, 222 A.3d 79. "Accordingly, when mootness is raised, we must inquire whether decision of a once living dispute continues to be justified by a sufficient prospect that the decision will have an impact on the parties." Id. (quotation and alteration omitted).

¶ 18. This Court will consider a case that no longer involves a live controversy if the challenged action "will continue to pose negative consequences for the appellant if it is not addressed." Paige, 2017 VT 54, ¶ 15. We have applied this exception in cases involving involuntary-hospitalization orders because the consequences of such orders "may continue to plague [individuals who have been subject to such orders] with both legal disabilities and social stigmatization." State v. J.S., 174 Vt. 619, 620, 817 A.2d 53, 55-56 (mem.) (citing State v. Condrick, 144 Vt. 362, 363, 477 A.2d 632, 633 (1984)). We have also applied it to post-conviction challenges to criminal convictions. See In re Chandler, 2013 VT 10, ¶¶ 12-13, 193 Vt. 246, 67 A.3d 261 (noting that "federal courts presume that a wrongful criminal conviction has continuing collateral consequences" sufficient to defeat a mootness challenge (quotation omitted)).

¶ 19. Stalking and sexual-assault orders may have negative collateral consequences even after they expire, and therefore may fall under the collateral-consequences exception to mootness. We have recognized that relief-from-abuse orders can result in "collateral consequences of a lasting nature." Fox v. Fox, 2014 VT 100, ¶ 21, 197 Vt. 466, 106 A.3d 919 (quoting Bartsch v. Bartsch, 636 N.W.2d 3, 12 (Iowa 2001) (Carter, J., dissenting)). The same is true of stalking and

sexual-assault orders. In Vermont, stalking orders are filed in police departments and in the Department of Public Safety's protection-order database. 12 V.S.A. § 5137. The presence of these records, even after the order has expired, may impact other legal proceedings in the family division or elsewhere, and may make it more difficult for a defendant to obtain employment, housing, and education. See Chretien v. Chretien, 2017 ME 192, ¶ 9, 170 A.3d 260 (describing ongoing effects of protective order); Shawn E. Fields, Debunking the Stranger-In-The-Bushes Myth: The Case for Sexual Assault Protection Orders, 2017 Wis. L. Rev. 429, 488 n.287 (advocating for sexual-assault protection orders, but cautioning legislators of "very real, damaging, and long-term effects the presence of a restraining order on one's record has on future educational, employment, and housing prospects" that "often outlive the terms of the restraining order itself"). Restraining orders, including stalking orders, also carry significant stigma and reputational harms. See Joann Sahl, Can We Forgive Those Who Batter? Proposing an End to the Collateral Consequences of Civil Domestic Violence Cases, 100 Marq. L. Rev. 527, 539-40 (2016).

¶ 20. Due to these collateral consequences, particularly stigma, numerous other states have applied the collateral-consequences exception to the mootness doctrine in cases involving restraining orders. See, e.g., Putnam v. Kennedy, 900 A.2d 1256, 1262-64 (Conn. 2006) ("[B]eing the subject of a court order intended to prevent or stop domestic violence may well cause harm to the reputation and legal record of the defendant."); Hamilton ex rel. Lethem v. Lethem, 193 P.3d 839, 849 (Haw. 2008) ("[T]he issuance of the TRO could . . . adversely affect [the defendant's] personal and professional life, employability, associations with neighbors, and choice of housing." (quotation and alteration omitted)); Chretien, 2017 ME 192, ¶ 8 ("[A] growing number of jurisdictions have observed that protective orders predictably generate collateral consequences affecting a party against whom the order was issued . . . ." (listing cases)); Seney v. Morhy, 3 N.E.3d 577, 581-82 (Mass. 2014) ("The defendant here still has a stake in the outcome of the

appeal, including removing any stigma from her name through the destruction of the [civil harassment] order.").

¶ 21.    We therefore conclude that when a defendant appeals a stalking order while still subject to the stalking order, the expiration of the stalking order will not automatically render the case moot.    Cf. Chandler, 2013 VT 10, ¶ 6 (holding that post-conviction-relief petition can be heard if filed while petitioner was in custody, even if petitioner is no longer under sentence).    In this case, defendant has established an individualized likelihood of ongoing reputation harm based on, among other considerations, the numerous articles already published about the stalking order and surrounding events.    See A. Galloway, Sexual harassment fallout in a small town, VTDigger.org (Feb. 19, 2019), https://vtdigger.org/2019/02/19/stowe-author-national-political-strategist-appeals-stalking-order/ [https://perma.cc/393G-G34D].

¶ 22.    In holding that stalking orders can be subject to the collateral-consequences exception, we depart from our decision in State v. Mott, 166 Vt. 188, 198, 692 A.2d 360, 367 (1997).    In that case, defendant was subject to an abuse-prevention order due to a judgment entered against him while he was incarcerated.    The State charged him with violating the order and he subsequently moved to strike the order in family court, arguing that the State violated his due-process rights by failing to transport him to his hearing.    The family court denied his motion.    We held that the appeal of the family court's decision was moot because the abuse-prevention order had "long since expired."    Id. The defendant in that case does not seem to have raised—and we did not consider—the collateral-consequences exception based on the ongoing effects of a protective order.    However, to the extent that we implied that the collateral-consequences exception could not apply, we now overrule that decision.    Here, defendant has on ongoing interest in avoiding the reputational harms of a stalking order.

9

## II. Application of Stalking Statute

¶ 23. Stalking in the civil stalking statute means "to engage purposefully in a course of conduct directed at a specific person that the person engaging in the conduct knows or should know would cause a reasonable person to: (A) fear for [their] safety or the safety of a family member; or (B) suffer substantial emotional distress . . . ." 12 V.S.A. § 5131(6). A "[c]ourse of conduct" means "two or more acts over a period of time, however short, in which a person follows, monitors, surveils, threatens, or makes threats about another person, or interferes with another person's property." Id. § 5131(1)(A). The definition applies to acts conducted "directly or indirectly" and "by any action, method, device, or means," but cannot include constitutionally protected activity. Id.

¶ 24. Defendant argues that the court's conclusions were erroneous as a matter of fact and law. He argues that the court erred in concluding that unanswered telephone calls, sending books to plaintiff's husband, and one instance of staring at plaintiff in a coffee shop could constitute a "course of conduct" under § 5131. He argues that the court erred in relying on acts that were not part of the course of conduct in determining whether the course of conduct would cause a reasonable person fear or emotional distress. Finally, he argues that several of the court's factual findings were clearly erroneous with regard to the phone calls and coffee-shop incident, and that the court erroneously applied an "eggshell plaintiff" standard rather than the "reasonable person" standard. Plaintiff argues that in addition to the three types of conduct discussed by the trial court, defendant threatened her by sending emails to C.D. and B.A. and emailing the article he wrote to plaintiff.

¶ 25. Because "stalking" is a crime as well as a civil matter, we construe the civil stalking statute narrowly. We conclude that under the facts of this case, neither calling plaintiff's phone repeatedly nor sending books to plaintiff and C.D.'s house constituted part of a course of conduct, as they were not monitoring, surveilling, or threatening another person. We also reject plaintiff's

argument that either defendant's emails or the article he published in the Stowe Reporter were threats. Because we reverse on those grounds, we need not reach the remainder of defendants' arguments.

¶ 26. In considering this appeal, we interpret the stalking statute and review the court's legal conclusions without deference. McCool v. Macura, 2019 VT 85, ¶ 6, __ Vt. __, 224 A.3d 847. We defer to the trial court's factual findings if supported by the evidence. Id.

### A. Construction of Civil Stalking Statute Generally

¶ 27. Our construction of the civil stalking statute is grounded in its history and context in the statutory scheme. Vermont law defines stalking in two statutes: the first criminalizes stalking behavior and the second provides for the imposition of civil stalking orders. In enacting the civil stalking statute, the Legislature borrowed most of the criminal definition. It then amended both statutes to further unify the definitions, leaving only some slight differences not relevant to this case. To the extent the same definitions apply in both civil and criminal contexts, we interpret the civil statute in accordance with the rule of lenity normally applied to criminal statutes.

¶ 28. Since its enactment, the civil stalking statute has mirrored the language of the criminal stalking statute. The first version of the civil statute, enacted in 2006, borrowed the definition of stalking from the criminal statute at the time except that it replaced "harassing" with "threatening behavior." Compare 2005, No. 83, § 4, with 2005, No. 193 (Adj. Sess.), § 1. "[H]arassing" under the criminal statute and "threatening behavior" in the civil statute had similar definitions that each included "verbal threats, written, telephonic, or other electronically communicated threats, vandalism, or physical contact without consent." Compare 2005, No. 83, § 4, with 2005, No. 193 (Adj. Sess.), § 1.

¶ 29. In 2016, the Legislature amended the statutes to mirror each other even more closely. The criminal statute now defines "stalk" as "to engage purposefully in a course of conduct directed at a specific person that the person engaging in the conduct knows or should know would

11

cause a reasonable person to fear for his or her safety or the safety of another or would cause a reasonable person substantial emotional distress." 13 V.S.A. § 1061(4). The civil statute uses identical language but replaces "another" with "family member" and defines emotional distress in slightly different terms. Compare 12 V.S.A. § 5131(6) with 13 V.S.A. § 1061(2), (4). The definitions of "course of conduct" and "reasonable person" in the two statutes are identical. Compare 12 V.S.A. § 5131(1), (4) with 13 V.S.A. § 1061(1), (3). The Legislature's treatment of these statutes indicates a clear intent that as a general matter the essential components of "stalking" are the same under the criminal and civil statutes.[1]

¶ 30. Because the Legislature has applied both civil and criminal sanctions to the same definition of stalking, we interpret this civil statute as if it were a criminal statute. "[L]aws relating to a particular subject should be construed together and in harmony if possible." State v. Blake, 2017 VT 68, ¶ 9, 205 Vt. 265, 174 A.3d 126 (quotation omitted). When we construe a statute, we must analyze "not only its language, but also its purpose, effects and consequences." Id. (quotation omitted). In this case, any conduct that we hold warrants the imposition of a stalking order could also theoretically subject a defendant to criminal sanctions, based not only on a violation of the stalking order but on the underlying conduct itself. The sanction for criminal stalking can be up to two years' imprisonment. 13 V.S.A. § 1062. Thus, although this defendant does not currently face charges that could lead to imprisonment, we interpret the statute as if he did.

¶ 31. "As a general rule, we interpret criminal statutes in the defendant's favor . . . ." State v. Witham, 2016 VT 51, ¶ 10, 202 Vt. 97, 147 A.3d 1005. When the language of a statute is

---

[1] There are some exceptions to this general observation, such as in the definition of emotional distress, which is different in the respective statutes. In a criminal case, emotional distress "means significant mental suffering or distress that may, but does not necessarily, require medical or other professional treatment or counseling." 13 V.S.A. § 1061(2). A civil plaintiff, on the other hand, must show evidence of "(i) a fear of unlawful sexual conduct, unlawful restraint, bodily injury, or death; or (ii) significant modifications in the person's actions or routines." 12 V.S.A. § 5131(6)(B). None of the differences between the statutes are material to our analysis in this appeal.

12

plain and unambiguous, our "goal is to implement the intent of the Legislature by giving effect to the plain language of the statute." State v. Reed, 2017 VT 28, ¶ 20, 204 Vt. 399, 169 A.3d 1278. However, "the rule of lenity requires that any doubts created by ambiguous legislation be resolved in favor of the defendant." State v. Berard, 2019 VT 65, ¶ 17, __ Vt. __, 220 A.3d 759 (quotation omitted). This rule ensures that statutes provide "fair warning of the legal consequences for committing certain, defined acts." In re K.A., 2016 VT 52, ¶ 9, 202 Vt. 86, 147 A.3d 81.

¶ 32. The dissent rightly notes that the civil stalking statute has a remedial purpose, and that ordinarily we construe a remedial statute broadly to effectuate its underlying remedial purpose. Post, ¶ 54. It emphasizes that we have applied this maxim of statutory interpretation to the related civil relief-from-abuse statute. Post, ¶ 56. What sets the civil stalking statute apart from other remedial statutes, and distinguishes it from the relief-from-abuse statute, is that the same conduct that supports a civil stalking order supports a criminal prosecution for stalking. Compare 12 V.S.A. § 5131 et seq. (civil stalking statute) with 13 V.S.A. §§ 1061-1064 (criminal stalking statute).[2]

¶ 33. The dissent's suggestion that courts can and should apply the very same definitions of stalking differently in the civil and criminal contexts (broadly in the former, narrowly in the latter) is unpersuasive for two reasons. See post, ¶ 60. First, in contrast to the cases relied upon by the dissent, this is not simply a matter of a word or phrase imparting different meanings in the context of distinct and unrelated statutes; here, the civil and criminal statutes cover the same subject matter using the same definitions and were clearly directed at the same conduct. Contrast State v. Gibney, 2003 VT 26, ¶¶ 50-51, 175 Vt. 180, 825 A.2d 32 (concluding that trial court erred in using remedial victim compensation statute's definition of "victim," which includes family

---

[2] The crime of domestic assault, 13 V.S.A. § 1042, incorporates many of the same elements as the relief-from-abuse statute, 15 V.S.A. § 1101, but the language and history of these statutes, in contrast to the stalking statutes, does not evince a legislative intent that they be construed as reaching the same conduct.

members of homicide victims, in applying an unrelated sentencing statute providing that "multiple victims" is an aggravating factor in a murder sentence); State v. Oliver, 151 Vt. 626, 629, 563 A.2d 1002, 1004 (1989) (contrasting narrower application of the term "person" in criminal statute, which targets careless and negligent operation of a motor vehicle resulting in the death of a person, with broader application in civil wrongful-death statute, which applies to unborn, viable fetuses); State v. Simmons, 327 A.2d 843, 844-45 (R.I. 1974) (construing the phrase "any injury to the person . . . of another" to apply only to physical injury in statute criminalizing malicious threats, and contrasting with broad construction of the phrase to include threats to reputation when determining whether a libel judgment is exempt from discharge in bankruptcy as a "willful and malicious injury to the person").

¶ 34.    Second—and closely related—by its plain and express language, the Legislature has indicated its intent that, with the exceptions noted, the two stalking statutes apply to the same conduct.  Our task in applying a statute is to effectuate the intent of the Legislature; the maxim favoring broad construction of remedial statutes does not trump the touchstone of legislative intent as reflected in the express terms of the statute.  See Marden v. Walton, 142 Vt. 204, 207, 455 A.2d 321, 322 (1982) (noting that remedial purpose of statute and associated liberal interpretation "does not warrant an interpretation which is not justified by its clear and express language").  Because the elements of "stalking" in the civil statute are identical in material ways to the definition in the criminal statute, given that the two statutes apply to the same subject matter, and given that the Legislature recently amended the statutes so that they mirror each other more closely, we cannot agree that the Legislature intended for the two statutes to have such divergent applications.  And concluding that the elements and definitions (not just isolated words or phrases) in the respective statutes mean two different things would be incongruous.  See, e.g., Barrows v. Easton, 2020 VT 2, ¶ 16, __ Vt. __, 227 A.3d 1030 (construing statute to avoid inconsistent definitions of "custodial parent" for parentage, child support, and tax purposes); State v. Charette, 2018 VT 48, ¶ 8, 207 Vt.

14

372, 189 A.3d 67 (construing statute to avoid inconsistent treatment of offenders who engaged in identical conduct).

## B. Phone Calls

¶ 35. The first issue before us is whether defendant's acts of making phone calls to plaintiff's cell phone could, under the facts of this case, be part of a "course of conduct" within the meaning of 12 V.S.A. § 5131. The trial court found that the "repeated calls properly constitute monitoring conduct for purposes of § 5131(1)." In concluding that the phone calls constituted monitoring, the trial court relied on the facts that the calls were masked to conceal defendant's identity, that the majority of the calls were placed late in the evening, and that it found defendant's explanation for the phone calls not credible. Defendant challenges the court's conclusion that the phone calls were part of a course of conduct, and he challenges the court's factual findings with regard to the number of phone calls and the times of the phone calls. Plaintiff argues that the phone calls should be considered monitoring, and she suggests that in the alternative they could be considered threats. She also argues that defendant failed to preserve this issue for appeal. We conclude that the issue was preserved, and without reaching the factual issues, we determine that the phone calls were not monitoring or threatening behavior in this context.

¶ 36. Defendant adequately preserved his legal argument regarding the phone calls. Defendant's primary theory was that his repeated phone calls were directed at C.D., not plaintiff, and that his calls to plaintiff's cell phone were placed because that phone is listed as the business phone for Transegy, LLC. However, he also broadly denied that his behavior met the requirements for a course of conduct: in his proposed findings of fact and conclusions of law, defendant wrote that plaintiff's case failed "as a matter of law," that he "never followed, monitored or surveilled" plaintiff, and that he "never explicitly or implicitly threatened" her. The trial court rejected these proposed conclusions and explicitly found that the repeated calls "properly constitute monitoring conduct for purposes of § 5131(1)." We have stated, "The preservation rule is satisfied when the

trial court had a fair opportunity to consider, evaluate and rule upon the question raised on appeal." Vt. Built, Inc v. Krolick, 2008 VT 131, ¶ 10, 185 Vt. 139, 969 A.2d 80 (quotation omitted). While defendant "could have been more explicit" in explaining why these masked calls could not be considered monitoring, we conclude that the trial court had an opportunity to rule on the issue and did so. Id. ¶ 11.

¶ 37. In order to be acts constituting part of a course of conduct amounting to stalking, the phone calls must have been a form of following, monitoring, surveilling, threatening, or making threats about plaintiff, or interfering with plaintiff's property. 12 V.S.A. § 5131(1)(A).

¶ 38. To monitor means to "watch, keep track of, or check usually for a special purpose." Monitor, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/monitor [https://perma.cc/6623-C45C]; see also State v. Elliott, 2010 ME 3, ¶ 36, 987 A.2d 513 ("[M]onitor . . . means to watch, observe, or check esp. for a special purpose" (quotation omitted)). This definition is consistent with several of the definitions in the American Heritage College Dictionary: "[t]o keep track of systematically with a view to collecting information," "[t]o test or sample on a regular or ongoing basis," or "[t]o keep close watch over; supervise." American Heritage College Dictionary 881 (3d. ed. 1993). Monitoring, therefore, involves tracking or collecting some form of information about the person being monitored or their activities.

¶ 39. Even accepting the trial court's findings as to the number and timing of the phone calls, we conclude that there is insufficient evidence that defendant's conduct amounted to monitoring. The trial court made no findings, and we cannot conclude on the basis of the record evidence, that defendant's phone calls allowed him to track plaintiff's whereabouts or keep watch on her in any way. We can imagine a case in which an individual monitors another through these kinds of phone calls—for instance by calling a landline for the purpose of determining whether someone is home. See 12 V.S.A. § 5131(1)(A) (providing that monitoring can be achieved "by any action, method, device, or means"). However, the trial court made no findings explaining why

16

defendant's admittedly obnoxious conduct amounted to "monitoring," and there is no evidence that this was such a case.

¶ 40.    Consistent with the rule of lenity, we will not expand the definition of monitoring to include other forms of contact with defendant—even forms of contact that were disturbing to plaintiff or to a reasonable person in her situation.  The Legislature clearly intended to prohibit behaviors that involved keeping track of plaintiff, her activities, or her whereabouts.  To the extent that "monitoring" could be argued to encompass a broader field of disturbing, distressing or harassing contact, the Legislature must provide this broader definition explicitly.  See In re K.A., 2016 VT 52, ¶ 9 (noting that we interpret statutes "on the basis of their ordinary meaning" and that we interpret "penal statutes strictly" (quotation omitted)).

¶ 41.    We also decline to affirm on the alternate basis that the phone calls in this context constituted threats.  See State v. VanBuren, 2018 VT 95, ¶ 70, __ Vt. __, 214 A.3d 791 ("This Court may affirm the trial court's judgment on any basis, even if not relied upon by the trial court or briefed by the parties.").  Threatening, for purposes of the civil stalking statute, "shall not be construed to require an express or overt threat," but does not include constitutionally protected activity.  12 V.S.A. § 5131(1).  In this case, the trial court did not find that the phone calls constituted threats, and the evidence does not appear to support such a finding.  Plaintiff testified that the phone calls made her feel afraid, but she did not testify that she understood defendant to be communicating a threat against her, or what the implied threat would be.  Instead, she characterized the calls as "harassing" her.  And on appeal, although plaintiff states that the calls were "threatening," she does not offer a theory of how phone calls could constitute threats.  Although there may be contexts in which repeated masked calls could constitute threats, we conclude that plaintiff failed to show that these masked calls were threats under 12 V.S.A. § 5131(1).  Cf. State v. Waters, 2013 VT 109, ¶¶ 27, 32, 195 Vt. 233, 87 A.3d 512 (rejecting trial

17

court's instruction that "objectively annoying" text messages could constitute harassment under definition in prior criminal stalking statute).

## C. Shipments of Books

¶ 42. Plaintiff argues that defendant threatened her by sending several shipments of books, which she refers to as "RAPE books," to her house. The trial court found that defendant's explanation for ordering these deliveries—that he did so in an effort to educate C.D.—was "implausible." Instead, it found that a savvy person with defendant's experience "would have understood the implicit threat of potential retribution or retaliation that would have been perceived by a woman who received such books at her home." Defendant argues that the shipments of books could not be part of a "course of conduct directed at plaintiff" because they were not threats, were not "directed at" plaintiff, and were constitutionally protected activity. We construe "threaten" in 12 V.S.A. § 5131(1) to refer to only threats of physical harm. Given that interpretation of the statute, we agree with defendant that the shipments of books were not threats. As a result, we do not reach defendant's arguments that the shipments of books were not directed at plaintiff.

¶ 43. We interpret the word "threaten" in § 5131(1) to refer to threats of physical harm. We reach this conclusion for three reasons. First, by specifically excluding constitutional activity from the prohibited conduct, the statute is implicitly limited to "true threats." Second, this interpretation is consistent with our previous case law relating to threats. And third, to the extent that the definition of "threat" is ambiguous, the rule of lenity requires us to resolve the ambiguity in favor of defendant.

¶ 44. The civil stalking statute implicitly prohibits only true threats, because it excludes constitutionally protected activity from the definition of "course of conduct." 12 V.S.A. § 5131(1)(A). In State v. Noll, we examined the previous version of the criminal statute, 13 V.S.A. § 1062, which likewise excluded constitutionally protected activity. 2018 VT 106, ¶¶ 28-29, 208 Vt. 474, 199 A.3d 1054. The defendant in that case challenged the statute as facially

18

unconstitutional because it restricted free speech. We upheld the statute as constitutional, reasoning in part: "Insofar as expression may be part of the course of conduct that supports a stalking charge, it is, by definition, only that expression that is not protected by the First Amendment." Id. ¶ 29. We therefore concluded that the statute applied only to "true threats," which are not protected by the First Amendment. Id. ¶ 25. True threats " 'encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals.' " Id. ¶ 24 (quoting Virginia v. Black, 538 U.S. 343, 359 (2003)). Because the statute before us includes the same limiting language as the statute in Noll, it follows that the Legislature intended to reach only threats of physical harm.

¶ 45. This understanding is consistent with our previous interpretations of the term "threat" as an expression of an intent to inflict harm, particularly physical harm, on another person. We have interpreted "threat" to mean " 'a communicated intent to inflict harm on person or property.' " State v. Schenk, 2018 VT 45, ¶ 11, 207 Vt. 423, 190 A.3d 820 (quoting State v. Cole, 150 Vt. 453, 456, 554 A.2d 253, 255 (1988)). In the context of conditions of probation limiting threatening behavior, we have explained that a threat requires an " 'actual intent to put another in fear of harm or to convey a message of actual intent to harm a third party.' " State v. Johnstone, 2013 VT 57, ¶ 17, 194 Vt. 230, 75 A.3d 642 (quoting State v. Miles, 2011 VT 6, ¶ 8, 189 Vt. 564, 15 A.3d 596 (mem.)).[3]

---

[3] In a different context, we have taken a broader view of the meaning of "threat." In the context of an obstruction-of-justice charge, this Court found that a defendant threatened a potential witness by "express[ing] in direct statements and by innuendo the possibility that his testimony and the testimony of others at trial would harm the witness's reputation and could result in her losing custody of her daughter." State v. Ashley, 161 Vt. 65, 72, 632 A.2d 1368, 1372 (1993), superseded by statute, 2003 No. 73 (Adj. Sess.), § 6, as recognized in State v. Tavis, 2009 VT 63, ¶ 6, 186 Vt. 554, 978 A.2d 465. The obstruction-of-justice statute at issue in that case criminalized witness intimidation by "threats or force." It sought to address the consequences of certain threats for the administration of justice, rather than the injury suffered by the target of the threat. In that

¶ 46. Finally, to the extent that "threat" can and has been interpreted to encompass threats of nonphysical harms, the rule of lenity requires us to resolve any ambiguity in favor of defendant. In State v. Waters, we applied the rule of lenity to the definition of "harassment" in a relief-from-abuse order. 2013 VT 109, ¶ 27, 195 Vt. 233, 87 A.3d 512. We noted the "widely divergent definitions and understandings of the term in various contexts," from the "more restrictive definition" in Vermont's criminal stalking statute, to the "extremely broad, everyday usage of the term, which can reach a wide range of bothersome but not necessarily threatening activity." Id. ¶¶ 24, 27. We concluded that given the "wide range of legal and everyday uses of the term and the due-process-infused rule of lenity," the restrictive statutory definition was "the most appropriate touchstone" for determining whether defendant had violated the relief-from-abuse order. Id. ¶¶ 27, 32. Here, too, although "threaten" could refer to a wider range of acts, we will apply the more limited definition of threat as a communicated intent to inflict physical harm on another person.

¶ 47. Given this interpretation, we cannot conclude that defendant's act of shipping books to plaintiff's house amounted to a threat in these circumstances. The trial court found that the books were an "implicit threat of potential retribution or retaliation," and that a reasonable person in defendant's position would recognize that receiving the unsolicited shipments "would be disturbing and cause fear and emotional distress to a reasonable woman in [plaintiff's] position." However, even a threat of "potential retribution or retaliation" does not necessarily communicate an intent to physically harm another person. The trial court did not find that the books were meant to communicate an intent to physically harm plaintiff, and we conclude that these facts could not support such a finding. Defendant's sending the books could reasonably be

context, our embrace of a broader understanding of "threat" is consistent with legislative intent and the rule of lenity.

20

construed as threatening social retribution against C.D. and plaintiff based on C.D.'s alleged sexual misconduct. Such threats may be deeply (and reasonably) disturbing to plaintiff, but cannot constitute predicate acts establishing a course of conduct under the statute. Defendant's conduct may have been intrusive and bullying, but was not a threat of physical harm.

¶ 48. We disagree with plaintiff's assertion at oral argument that by "retribution or retaliation," the trial court meant that the books constituted a threat to rape plaintiff. If that was the meaning intended by the trial court, it would have said so explicitly. In any event, the evidence does not support such a finding. Plaintiff's testimony regarding her fears after receiving the books was as follows:

> It's insane. I—I don't know why he was sending books on rape to our house. I don't know if it was like a, oh, you had sex with my girlfriend, guess what I'm going to do to your wife. Like, I had no idea. It freaked me out. I was really upset.

Although plaintiff hinted that the book deliveries were a threat to rape her, she did not testify that she believed defendant would do so, and the context of the deliveries makes that theory implausible. Even plaintiff's proposed findings of fact did not state that the books communicated an intent to rape plaintiff, but merely stated (as the court found) that they were a threat of "some kind of retaliation or retribution." The evidence—including defendant's testimony, his repeated calls to plaintiff and C.D., his emails to C.D. and their family friend B.A., and the article he published—would support a finding that defendant's aim was to shame and socially ostracize C.D. for his alleged sexual assault of defendant's partner. It could even support a finding that defendant sought to shame plaintiff and harm her reputation in retaliation for her failing to "shun" C.D. on account of the allegations. But it could not support a finding that the shipments of books expressed an intent to rape or otherwise physically harm plaintiff. We therefore cannot conclude that the shipments of books were part of a "course of conduct" that could support a stalking order.

21

## D. Emails and Article

¶ 49.    The final set of issues we reach in this case relate to three emails sent by defendant: one to C.D., one to plaintiff and C.D.'s friend B.A., and one to plaintiff attaching defendant's article "What To Do With Bad Men: Shun Them." Plaintiff argues that the emails and article were threatening acts under § 5131 and are therefore part of defendant's course of conduct. We conclude that the communications cannot be part of a course of conduct because they are not threats of physical harm.

¶ 50.    Although plaintiff argues that the emails were threatening, none of them can be construed to threaten physical harm. Defendant's email to C.D. criticizes C.D. for his dishonesty with plaintiff and accuses him of "continuing to victimize" L.S. and her son by "having this party and then asking [L.S.]'s son not to share this with his mother." Although the email shows great antipathy to C.D., the email does not threaten to harm C.D. or plaintiff. Defendant's email to plaintiff has no content except for the attachment and link to the article he wrote on rape culture. The article states that defendant has seen a member of his community become "quietly exposed as a serial assaulter of women," and urges the community: "Shun these men. Do not allow them to return to normalcy . . . ." In context, this article is similar to the book shipments in that it may threaten C.D. and by extension plaintiff with social retribution—but it does not threaten physical harm. Finally, defendant's email to B.A. repeats the serious allegations against C.D. and argues that B.A. should hold C.D. accountable and stop associating with him. It does not mention plaintiff, nor does it advocate for or threaten harm against C.D. or plaintiff. This email cannot be construed as a threat, much less a threat of physical harm. We therefore reject plaintiff's arguments that these acts were threats and therefore part of a course of conduct.

¶ 51.    Because we conclude that defendant's emails, shipments of books, and phone calls could not be part of a course of conduct, only one instance of "monitoring" remains—defendant's act of sitting in a coffee shop and staring at plaintiff. We need not address the parties' arguments

22

regarding the coffee-shop incident, because a course of conduct must consist of "two or more acts." 12 V.S.A. § 5131(1)(A). The single coffee-shop incident could not be considered a course of conduct even if we concluded that it constituted monitoring. We therefore must reverse the trial court's decision and vacate the stalking order, and need not address defendant's remaining arguments.

¶ 52. We reiterate that our decision in this case is based on our consideration of the acts in context. It should not be read as establishing a rule that repeated phone calls, book deliveries to a person's home, or email communications could never be part of a course of conduct. We also take seriously the trial court's conclusion that defendant's conduct demonstrated a "fixation" on discrediting plaintiff's husband, and we are sensitive that such a fixation could be shown to imply more serious threats of harm. See Noll, 2018 VT 106, ¶ 41 ("The jury could reasonably conclude that . . . obsessive behavior would give rise to a heightened fear of unlawful restraint or bodily injury on the part of a reasonable person in complainant's circumstances."); Waters, 2013 VT 109, ¶ 28 (recognizing that in domestic-violence context, annoying or bothersome conduct "may mature into further incidents of abuse") (quotation and alteration omitted)). However, in this case plaintiff did not meet her burden to show that defendant "monitored" or "threatened" her on more than one occasion, and the evidence was therefore insufficient to support a stalking order under the civil stalking statute.

Reversed.

FOR THE COURT:

_____

Associate Justice

¶ 53. **REIBER, C.J., dissenting.** The record and the trial court's findings support its conclusion that defendant stalked plaintiff. In holding otherwise, the majority has misapplied the rules of statutory construction and our standard of review. I respectfully dissent.

## I. Statutory Construction

¶ 54. The majority reasons that we must construe the civil stalking statute narrowly. This is error. The civil stalking statue is not a criminal statute, and the rule of lenity does not apply. See State v. Graham, 2016 VT 48, ¶ 17, 202 Vt. 43, 147 A.3d 639 ("In interpreting a criminal statute, the rule of lenity requires us to resolve any ambiguity in favor of the defendant." (quotation omitted)); State v. Oliver, 151 Vt. 626, 629, 563 A.2d 1002, 1004 (1989) ("Penal statutes . . . are to be strictly construed in a manner favorable to the accused."); see also In re Haley, 126 P.3d 1262, 1273-74 (Wash. 2006) (en banc) (Sanders, J., concurring) (explaining that, "[a]s a general rule, courts apply the rule of lenity to any statute imposing penal sanctions," including civil statutes). On the contrary, the civil stalking statute is a remedial statute, which should be liberally construed. See Raynes v. Rogers, 2008 VT 52, ¶ 15, 183 Vt. 513, 955 A.2d 1135 ("[R]emedial statutes . . . must be liberally construed to suppress the evil and advance the remedy intended by the Legislature." (quotation omitted)).

¶ 55. " 'Generally, remedial statutes are those which provide a remedy, or improve or facilitate remedies already existing for the enforcement of rights and the redress of injuries.' " Langston v. Riffe, 754 A.2d 389, 395 (Md. 2000) (quoting 3 N. Singer, Sutherland's Statutory Construction, § 60.02, at 152 (5th ed. 1993)); see also Carter v. Fred's Plumbing & Heating, Inc., 174 Vt. 572, 574, 816 A.2d 490, 493 (2002) (mem.) ("A remedial statute is one designed to cure a mischief or remedy a defect in existing laws . . . ." (quotation omitted)). In explaining the distinction between a penal statute and a remedial one, courts have stressed that a penal statute's purpose is punishment, whereas a remedial statute's purpose is to provide a private remedy. See Haley, 126 P.3d at 1274 ("A statute is penal if it can be punished by imprisonment and/or a fine and remedial if it provides for the remission of penalties and affords a remedy for the enforcement of rights and the redress of injuries." (quotation omitted)); see also Sch. Dist. of Omaha v. Adams, 26 N.W.2d 24, 27 (Neb. 1947) ("The distinction between a remedial and penal statute necessarily

24

lies in the fact that the latter is prosecuted for the sole purpose of punishment, and to deter others from offending in like manner. A remedial statute . . . is for the purpose of adjusting the rights of the parties as between themselves in respect to the wrong alleged."). We have explained that laws such as the Vermont Fair Housing and Public Accommodations Act, Act 250, and the Consumer Protection Act are remedial statutes that should be broadly construed to further their protective purposes. See Dep't of Corr. v. Human Rights Comm'n, 2006 VT 134, ¶ 3, 181 Vt. 225, 917 A.2d 451 (reasoning that Vermont Fair Housing and Public Accommodations Act "must be liberally construed to effectuate its remedial purpose"); State v. Therrien, 161 Vt. 26, 30-31, 633 A.2d 272, 275 (1993) (explaining that "Act 250 and the Consumer Fraud Act are remedial legislation" and "[w]e must apply remedial legislation liberally to accomplish its purposes"); see also 2011, No. 109 (Adj. Sess.), § 2 (renaming Consumer Fraud Act the Consumer Protection Act).

¶ 56.    Vermont's relief-from-abuse statute, 15 V.S.A. § 1103, serves a similar purpose. Raynes, 2008 VT 52, ¶ 15. It provides a private remedy by permitting a family or household member to seek a protective order against another family or household member when abuse has occurred and there is a danger of further abuse. 15 V.S.A. § 1103(a), (c)(1)(A). We emphasized in Raynes v. Rogers that the statute's purpose is to protect the victim, not punish the defendant. 2008 VT 52, ¶ 8. The statute "focus[es] solely on the plaintiff's need for immediate and prospective protection from the defendant rather than the defendant's liability for abusing the plaintiff," id. § 13, and it is "aimed at ending the cycle of domestic violence before it escalates," id. ¶ 8. We concluded that the relief-from-abuse statute was a remedial statute that must be liberally construed to effectuate its legislative purpose. Id. ¶ 15. Despite amending the statute three times since Raynes was decided, the Legislature has not disturbed our construction, suggesting our interpretation aligns with the legislative intent. 2017, No. 44, § 8; 2015, No. 153 (Adj. Sess.), § 31; 2013, No. 17, § 8; Dubaniewicz v. Houman, 2006 VT 99, ¶ 13, 180 Vt. 367, 910 A.2d 897 (explaining that courts have held "legislative inaction following a contemporaneous

25

and practical interpretation is evidence that the legislature intends to adopt such an interpretation" (quotation omitted)).

¶ 57. The civil stalking statute is also remedial. It provides that someone other than a family or household member may seek a protective order upon a showing that the defendant has stalked the plaintiff. 12 V.S.A. § 5133. Its purpose is preventative, as the Legislature has made clear, stating in Act 162 of 2016:

> The General Assembly find the following:
>
> (1) Stalking is a serious problem in Vermont and nationwide.
>
> (2) Stalking involves severe intrusions on the victim's personal privacy and autonomy.
>
> (3) Stalking causes a long-lasting impact on the victim's quality of life and creates risks to the security and safety of the victim and others even in the absence of express threats of physical harm.
>
> (4) Stalking conduct often becomes increasingly violent over time.
>
> (5) There is a strong connection between stalking and domestic violence and sexual assault.

2015, No. 162 (Adj. Sess.), § 1. Like the relief-from-abuse statute, the civil stalking statue is aimed at protecting the plaintiff from stalking behavior before it escalates to more intrusive or violent action, such as sexual assault. See id.; Raynes, 2008 VT 52, ¶ 8. Although an anti-stalking protective order may cause negative collateral consequences for the defendant, its sole focus is to provide a remedy for the victim of stalking, not to punish the defendant. See 12 V.S.A. § 5133; Raynes, 2008 VT 52, ¶ 13. As a remedial statute, it should be construed liberally. Raynes, 2008 VT 52, ¶ 15. To do otherwise would frustrate the Legislature's protective purpose. See Lockett v. Blue Ocean Bristol, LLC, 132 A.3d 257, 272 (Md. 2016) ("We seek to construe the statute in a way that will advance the statute's purpose, not frustrate it." (quotation and alteration omitted)).

¶ 58. But the majority holds that the civil stalking statute should be construed narrowly, as if it were a criminal statute. It observes there is a parallel criminal stalking statute that defines

26

"stalking" with nearly identical terms. Ante, ¶¶ 27-30. The majority cites no case law for the proposition that a remedial statute should be construed narrowly when there is a related criminal statute that addresses the same conduct. The majority relies on the rule of statutory construction that "laws relating to a particular subject should be construed together and in harmony if possible," State v. Blake, 2017 VT 68, ¶ 9, 205 Vt. 265, 174 A.3d 126 (quotation omitted), reasoning that the civil and criminal stalking statutes must be construed together. Ante, ¶ 30. I agree that our construction of each stalking statute is relevant to our construction of the other. See infra, ¶ 65; cf. Hanzo v. deParrie, 953 P.2d 1130, 1139 (Or. Ct. App. 1998) (holding that narrowing construction to avoid overbreadth challenge that was applied to criminal stalking statute also applies to civil stalking statute). But the majority takes the principle too far in applying a strict construction to a remedial statute.

¶ 59. In fact, this rule of construction that "laws relating to a particular subject should be construed together and in harmony if possible," Blake, 2017 VT 68, ¶ 9 (quotation omitted), instead supports a broad interpretation of the civil stalking statute, not a narrow one. Although the civil and criminal stalking statutes both relate to the same subject, and they use nearly the same definition for "stalking," there is a more obvious relationship between the civil stalking statute and the civil relief-from-abuse statute, one not found with the criminal stalking statute. The civil relief-from-abuse statute explicitly defines "abuse," in part, as "stalking," with reference to the civil, not criminal, stalking statute. See 15 V.S.A. § 1101(1)(D) (defining "[a]buse" in context of relief-from-abuse statute as "[s]talking as defined in 12 V.S.A. § 5131(6)"); see also 12 V.S.A. § 5131(6) (defining stalking in civil protective-order context); 13 V.S.A. § 1061(4) (defining stalking in criminal context). More significantly, both protective-order statutes are remedial, not penal, with the same protective purpose. See Bd. of Trs. of Kellogg-Hubbard Library, Inc. v. Labor Relations Bd., 162 Vt. 571, 574, 649 A.2d 784, 786 (1994) ("[C]haracterization of the object or purpose is more important than characterization of subject matter in determining whether different statutes

27

are closely enough related to justify interpreting one in light of the other." (quotation and alteration omitted)). The principle that "laws relating to a particular subject should be construed together and in harmony if possible," Blake, 2017 VT 68, ¶ 9 (quotation omitted), guides us to interpret the civil stalking statute and the relief-from-abuse statute together—liberally in protection of the plaintiff—and does not lead us to interpret a remedial statute as if it were a criminal one.

¶ 60.    Unlike the rule the majority proposes, construing the same or similar statutory terms differently based on their penal or remedial context is not novel. We have previously held that terms in remedial statutes should be interpreted broadly, while the same terms in similar criminal statutes should be interpreted strictly. See, e.g., State v. Gibney, 2003 VT 26, ¶ 51, 175 Vt. 180, 825 A.2d 32 (holding "victims" in 13 V.S.A. § 2303(d)(6) (2003) has different meaning from "victim" in 13 V.S.A. § 5301(4) (2003), in part, because "[t]he main purpose of Vermont's victim compensation law is remedial" and therefore "should be liberally construed to accomplish its purposes," whereas "§ 2303 is part of a penal statute, which must be strictly construed in a manner favorable to the accused," and "the different natures of [these] statute[s] . . . require different constructions of their key terms"); Oliver, 151 Vt. at 629, 563 A.2d at 1004 (holding "person" in wrongful-death statute should be "construed liberally" because statute is "remedial in nature," but "person" in criminal statute punishing grossly negligent operation of vehicle that results in death should be "strictly construed in a manner favorable to the accused"); see also State v. Simmons, 327 A.2d 843, 845 (R.I. 1974) ("In this case, . . . the legislation is penal rather than remedial, and because it is penal the same language liberally construed in [another case] must be read narrowly here . . . ."). Similarly, many state courts have held that where a statute is both remedial and penal, the remedial portions of the statute should be interpreted broadly, but the penal portions should be construed narrowly. See, e.g., State ex rel. Dep't of Transp., Div. of Highways v. Sommerville, 412 S.E.2d 269, 271 (W. Va. 1991) (holding that "where a statute contains provisions which are both remedial and penal, such statute should be considered remedial," and construed liberally,

28

"when seeking to enforce the purpose for which it was enacted," but it "should be considered penal," and construed strictly, "when seeking to enforce the penalty provided therein").

¶ 61. The majority goes on to reason that the civil stalking statute should be construed narrowly because, considering that the definitions of stalking in the civil and criminal stalking statutes overlap, "the conduct that we hold warrants the imposition of a stalking order could also theoretically subject a defendant to criminal sanctions." Ante, ¶ 30; see 13 V.S.A. § 1062 ("Any person who intentionally stalks another person shall be imprisoned not more than two years or fined not more than $5,000.00, or both."). But the same commonality exists between the civil stalking statute and the relief-from-abuse statute. Given the shared definition of stalking in the relief-from-abuse and civil stalking statutes, a family court could determine that certain conduct constituted criminal stalking when issuing a relief-from-abuse order. See 15 V.S.A. § 1101(1)(D) (defining "abuse" in context of relief-from-abuse statute as "[s]talking as defined in 12 V.S.A. § 5131(6)"). Yet, rightly, we have held that the relief-from-abuse statute is remedial and must be construed broadly. Raynes, 2008 VT 52, ¶ 15.

¶ 62. Moreover, we must presume that the Legislature is aware of our judicial precedents interpreting the relief-from-abuse statute, as well as our canon of construction that remedial statutes—like the civil stalking statute—should be construed liberally. See State v. Read, 165 Vt. 141, 147, 680 A.2d 944, 948 (1996) ("We . . . presume that the Legislature makes changes in the law in light of relevant judicial precedents and with knowledge of prior legislation on the same subject."); see also Yachcik v. Yachcik, 900 N.W.2d 113, 123 (Mich. Ct. App. 2017) ("[W]e must presume that the Legislature was aware of judicial interpretations of the existing law when passing legislation. We also must presume that the Legislature was familiar with the rules of statutory construction . . . ." (quotations omitted)). The Legislature has not expressed, implicitly or explicitly, any intention for this Court to construe the remedial civil stalking statute strictly,

29

contrary to how we have interpreted the closely related relief-from-abuse statute, and in contradiction of our well-settled law in this important area.

## II. Standard of Review

¶ 63.    I also disagree with the majority's application of the standard of review.  This type of matter calls upon the trial bench to construe intensely personal interactions under the umbrella of the law.  Of course, it is true, as the majority notes, that "[o]ur review of legal conclusions is nondeferential and plenary."  McCool v. Macura, 2019 VT 85, ¶ 6, __ Vt. __, 224 A.3d 847 (quotation omitted).  But that does not mean we are free to set aside a legal conclusion that is reasonably supported by the factual findings.  Where the court has come to a legal conclusion based on good law, and where that conclusion is reasonably supported by the factual findings and the evidence, we should not disturb the court's judgment.  See id. ("On appeal we review the family court's decision to grant or deny a protective order only for an abuse of discretion, upholding its findings if supported by the evidence and its conclusions if supported by the findings." (quotation omitted)); see also Dunning v. Meaney, 161 Vt. 287, 289-90, 640 A.2d 3, 5 (1993) (stating in child-custody case that "[a]s long as the findings reasonably support the judgment, we will uphold the court's decision"); Armstrong v. Hanover Ins. Co., 130 Vt. 182, 185, 289 A.2d 669, 671 (1972) (holding in declaratory-judgment case that "this Court must construe [the factual findings] so as to support the judgment, if possible").

¶ 64.    This greatly deferential standard of review is necessary because of the unique role the trial court plays in evaluating the evidence in this type of case.  As the family division does in relief-from-abuse cases, the civil division in stalking cases occupies "a unique position to assess the credibility of witnesses and weigh the strength of [the] evidence" related to intensely personal matters.  See Raynes, 2008 VT 52, ¶ 9; see also Benson v. Hodgdon, 2010 VT 11, ¶ 10, 187 Vt. 607, 992 A.2d 1053 (mem.) ("Our review of a trial court's finding of fact is curbed by our deference to that tribunal's unique position to assess witness credibility and the weight of evidence

presented . . . ."); cf. Patnode v. Urette, 2014 VT 46, ¶ 5, 196 Vt. 416, 98 A.3d 787 (affording "substantial deference" to family court's ruling on parent-child contact as "a result of the court's unique position as the trier of fact to evaluate the credibility of witnesses and weigh evidence in the highly fact-intensive context of parental custody and visitation rights" (quotation omitted)).

¶ 65.   Giving appropriate deference to the trial court is particularly important in a protective-order proceeding, where the meaning of events depends heavily on the factual context. Cf. State v. Noll, 2018 VT 106, ¶ 38, 208 Vt. 474, 199 A.3d 1054 ("We have . . . recognized that, under our criminal stalking statute, whether conduct amounts to stalking may depend on the context."); Baird v. Baird, 2014 UT 08, ¶¶ 26-27, 322 P.3d 728 (interpreting civil stalking statute and holding that in determining whether stalking has occurred "a court must consider the entire context surrounding defendant's conduct" and citing cases that have considered context in making stalking determination, including "the victim's background, the victim's knowledge of and relationship with the defendant, . . . and the cumulative effect of defendant's repetitive conduct" (footnotes omitted)).

¶ 66.   If we take too free a hand with the trial court's legal conclusions, we run the risk— while intending to review only the law—of replacing the court's judgment of the facts with our own.  See Whipple v. Lambert, 145 Vt. 339, 341, 488 A.2d 439, 440 (1985) ("In no event will we substitute our judgment on questions of fact for that of the trial court."); cf. In re M.E., 2019 VT 90, ¶ 22, __ Vt. __, 225 A.3d 633 (stating in context of petition to adjudicate that child was in need of supervision (CHINS) that "[o]ur role as an appellate court is not to second-guess the family court or to make our own assessment of the evidence"); Coates v. Coates, 171 Vt. 519, 522, 769 A.2d 1, 5 (2000) (mem.) (Amestoy, C.J., dissenting) (urging in domestic-violence case that Court should be "cautious in substituting our judgment—on the basis of a cold record—for that of the judge who heard the testimony").  In my view, the majority has failed to uphold legal conclusions

that are reasonably supported by the findings and the evidence and, in doing so, inappropriately replaced the trial court's judgment with its own.

## III.  Analysis

¶ 67.    With the foregoing in mind, I would affirm the trial court's conclusion that calling plaintiff's phone in these circumstances was "monitoring" under the statute.  The trial court made the following factual findings regarding defendant's phone calls: defendant called plaintiff's cell phone twenty-six times between April 2017 and March 2018; he called her from four different telephone lines, including his business cell phone, a Quebec landline, a Stowe landline, and a Vonage voice-over-internet line; "[t]he majority of the calls were placed after business hours and many were late at night, i.e., after 10 or 11 pm."; defendant blocked his Caller ID by dialing *67 before each call; he did not leave a message if no one answered the phone; and defendant called or texted plaintiff's and plaintiff's husband's cell phone 151 times.  These findings, which are supported by plaintiff's testimony and plaintiff's cell phone records admitted at trial, are sufficient to support the court's conclusion that the calls were "monitoring" under the statute.  See McCool, 2019 VT 85, ¶ 6; see also Armstrong, 130 Vt. at 185, 289 A.2d at 671 (holding factual "findings must stand if there is any credible evidence which fairly and reasonably supports them" and that "this Court must construe [the findings] so as to support the judgment, if possible").  Because the findings the court made were sufficient, the court was not required to make additional findings further explaining its decision.  See Smith v. Wright, 2013 VT 68, ¶ 16, 194 Vt. 326, 79 A.3d 876 (reasoning that "[e]xtensive findings are not generally required in civil abuse proceedings, which are aimed at providing relief to the putative victim rather than punishing the alleged perpetrator," and rejecting defendant's argument in relief-from-abuse proceeding that evidence and court's findings failed to support court's conclusion that plaintiff was "a vulnerable adult" because defendant failed to preserve argument and record supported court's conclusion).

¶ 68. Nonetheless, the majority holds that defendant's conduct was not "monitoring" as a matter of law. See 12 V.S.A. § 5131(6) (defining "[s]talk" as "to engage purposefully in a course of conduct directed at a specific person that the person engaging in the conduct knows or should know would cause a reasonable person to . . . fear for his or her safety . . . or . . . suffer substantial emotional distress"), id. § 5131(1)(A) (defining "[c]ourse of conduct" as "two or more acts over a period of time, however short, in which a person follows, monitors, surveils, threatens, or makes threats about another person"). I disagree. Defendant's repeated "masked" phone calls, made late in the evening or at night, and within the context of defendant's other conduct, can reasonably be considered as "monitoring" according to the plain language of the statute. As the majority notes, "monitor" may be defined as "watch[ing], keep[ing] track of, or check[ing] . . . for [a] special purpose." Monitor, Merriam-Webster.com Online Dictionary, https://www.merriam-webster.com/dictionary/monitor [https://perma.cc/6623-C45C]. An alternative definition is "[t]o keep track of systematically with a view to collecting information." Monitor, American Heritage Online Dictionary, https://ahdictionary.com/word/search.html?q=monitor [https://perma.cc/3GJ7-BTKA]. Defendant's actions fit within these definitions. "Monitoring" does not require that defendant effectively pinpointed plaintiff's physical location, as the majority suggests, and no evidence or findings were necessary to show that defendant's phone calls enabled him to "track plaintiff's whereabouts." Ante, ¶ 39. Insofar as the statute is ambiguous, we must construe it broadly in protection of the plaintiff because it is a remedial statute. See Raynes, 2008 VT 52, ¶ 15. It is possible that a different court could decide differently, and repeated phone calls will not constitute "monitoring" in every case. But based on the circumstances here, the trial court could reasonably conclude the calls were "monitoring" under the statute, and I would not disturb that conclusion. See McCool, 2019 VT 85, ¶ 6.

¶ 69. The majority also holds that the shipments of books to plaintiff's home were not a threat under the statute, stating that the "trial court did not find that the books were meant to

communicate an intent to physically harm plaintiff." Ante, ¶ 47. I disagree. The court emphasized how defendant said he had studied "what it must be like to be a woman who had been the victim of sexual assault" and had been told that plaintiff was "going through a tough time" following allegations that her husband had sexually assaulted defendant's partner. The trial court found that in that context, defendant "would have understood the implicit threat of potential retribution or retaliation that would have been perceived by a woman who received such books at her home." Although the court's language was not explicit, the court plainly found that the books were intended to communicate a threat to sexually assault plaintiff in the way that defendant's partner had been allegedly assaulted. This finding is supported by the evidence, and the finding reasonably supports the court's conclusion that this conduct constituted a "threat" under the statute. Accordingly, I would not disturb the court's conclusion. See McCool, 2019 VT 85, ¶ 6; Armstrong, 130 Vt. at 185, 289 A.2d at 671 ("The prescribed law of this state is that findings must stand if there is any credible evidence which fairly and reasonably supports them, and this Court must construe them so as to support the judgment, if possible . . . .").

¶ 70. The majority asserts the finding of a threat is not supported by the record because plaintiff did not testify that she believed defendant would attempt to rape her. Ante, ¶ 48. Plaintiff testified that the shipments "freaked [her] out" and "really upset [her]" because she did not "know if it was like a, oh, you had sex with my girlfriend, guess what I'm going to do to your wife." I disagree that this evidence fails to support the court's finding. Plaintiff stated that she believed defendant could be communicating a threat to sexually assault her. It is not necessary that she testify that she was certain defendant was threatening her with sexual assault or that she believed he would actually attempt to assault her. "[A] prohibition on true threats protects individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur." Virginia v. Black, 538 U.S. 343, 360 (2003) (quotation omitted). "The speaker need not intend to deliver on the threat." Noll, 2018 VT

34

106, ¶ 36. Plaintiff's testimony, understood within the surrounding circumstances, supported the court's finding. See Stickney v. Stickney, 170 Vt. 547, 548, 742 A.2d 1228, 1230 (1999) (stating that "when reviewing the factual findings of a trial court we view them in the light most favorable to the prevailing party below" and "[t]he findings will stand if there is any reasonable and credible evidence to support them").

¶ 71. I also disagree with the majority that only "true threats" are proscribed by the statute. Ante, ¶ 44. "[T]hreatens" and "makes threats" in 12 V.S.A. § 5131 may include threatening behavior. 12 V.S.A. § 5131(1)(A) (explaining "acts . . . in which a person follows, monitors, surveils, threatens, or make threats . . . shall apply to acts conducted by the person directly or indirectly, and by any action, method, device, or means"). A prohibition on threatening behavior "proscribes conduct, not speech, and therefore does not penalize speech." State v. Albarelli, 2011 VT 24, ¶ 9, 189 Vt. 293, 19 A.3d 130 (discussing "threatening behavior" in context of disorderly conduct statute). Only where the threat consists purely of speech will it implicate First Amendment protections. Id. Regardless, in this case, I would hold that the trial court made a factual finding that defendant communicated a true threat here and that the finding is supported by the record. See Noll, 2018 VT 106, ¶ 24 (defining "true threats" as "those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals" (quotation omitted)).

¶ 72. Because the majority concluded that defendant's actions in calling plaintiff and shipping her the books did not fit the definition of "stalking" under the statute, the majority did not reach whether his action in the coffee shop was part of a "course of conduct" under the stalking statute. Defendant argues that the court's factual finding regarding the coffee shop was clearly erroneous, but the finding is supported by plaintiff's testimony, and the court was entitled to find her credible. Rogers v. Parrish, 2007 VT 35, ¶ 28, 181 Vt. 485, 923 A.2d 607 ("[T]he trial court has considerable discretion to assess the credibility of witnesses and weigh the evidence, and we

will not disturb its findings unless clearly erroneous.").  Like the trial court, I conclude that defendant's conduct in the coffee shop was "monitoring" under the statute.

¶ 73.    Because defendant stalked plaintiff by engaging in a "course of conduct" as defined by 12 V.S.A. § 5131(1)(A), and the other requirements of the civil stalking statute were met, I would affirm.  12 V.S.A. §§ 5133.

¶ 74.    I am authorized to state that Judge Howard (Ret.) joins this dissent.

_____
Chief Justice