NOTICE:  This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports.  Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2023 VT 26

No. 22-AP-143

| | |
|---|---|
| Elizabeth Swett, Doug Earle, Gordon Stake | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Rutland Unit, |
| | Civil Division |
| | |
| Brian Gates | October Term, 2022 |

Helen M. Toor, J.

Antonietta Girardi Dutil of Facey Goss & McPhee P.C., Rutland, for Plaintiffs-Appellees.

Nancy Corsones and Wendy Fitzsimons of Corsones and Fitzsimons, LLP, Rutland, for
  Defendant-Appellant.

PRESENT:  Reiber, C.J., Eaton, Carroll, Cohen and Waples, JJ.


¶ 1.     **WAPLES, J.**  Defendant appeals from the trial court's extension and modification of three stalking orders against him.  He raises numerous arguments, many of which relate to the requirements for the issuance of initial stalking orders rather than extensions of those orders.  We conclude that the court acted within its discretion in extending and modifying the orders and we therefore affirm.

### I.  Factual Background

¶ 2.     The parties are longtime neighbors who live on the same street in Mendon, Vermont.  Defendant owns a home on the street; he also owns a vacant lot next to the home of plaintiffs Swett and Earle.  In January 2021, plaintiffs sought stalking orders against defendant.  They alleged that defendant was engaging in aggressive and intimidating behavior, including

yelling and swearing at them, firing his gun to intimidate them, and otherwise acting in ways that made them fear for their physical safety. The court granted temporary relief to plaintiffs.

¶ 3.    In February 2021, the parties waived findings and stipulated to three one-year stalking orders—one order protecting each plaintiff. The orders prohibited defendant from contacting plaintiffs and ordered him to stay 100 feet away from them and their residences with exceptions for driving, plowing, and dog walking. The orders also prohibited defendant from discharging a firearm on his vacant lot until June 1, 2021.

¶ 4.    In February 2022, plaintiffs moved to extend and modify the orders, alleging that defendant continued to engage in intimidating, hostile, and aggressive behavior. Following a hearing, the court granted plaintiffs' request. It made the following findings. Before plaintiffs obtained stalking orders in February 2021, defendant repeatedly screamed profanities at plaintiffs Swett and Earle from his vacant lot. He told them he had "nothing better to do than to torture the fuck out of my neighbors!" On one occasion after an interaction with plaintiff Stake, defendant shot off over 100 rounds of ammunition on the vacant lot. He shot into a log pile between the open area of his lot and the Swett/Earle residence. Despite his denials, the court found that defendant was shooting in the direction of the Swett/Earle home to scare them.

¶ 5.    Turning to events after February 2021, the court found that defendant had been clearing the vacant lot for over a year. He said he was preparing to build something. Plaintiffs believed that defendant was purposefully using loud machinery on the lot for months on end to harass them. The court found that defendant intentionally parked his truck on dark mornings to shine his headlights into the Swett/Earle home to disturb them. It rejected defendant's assertion that he was simply sitting in his truck reading and checking email at 6 a.m. in that location. Defendant also sat in his car in the road and stared at the Swett/Earle home.

¶ 6.    In September 2021, defendant played an electronic game call of a rabbit in distress on the vacant lot for two hours in the late evening until the police arrived. Defendant testified that

2

he did not consider the sound annoying and wanted to see what animals were around for hunting purposes. The court rejected these propositions as not credible and absurd. It found defendant clearly intended to annoy plaintiffs Swett and Earle.

¶ 7. A security camera captured another incident with plaintiff Stake. Defendant was operating an excavator on the vacant lot and as soon as plaintiff Stake walked by with his dog, defendant began screaming at the top of his lungs. Defendant got progressively louder and unmistakably angrier. He used words like "you have a fat ugly wife" as well as cruder comments about both Mr. Stake and Mr. Stake's wife. According to defendant, he was not directing his words at Mr. Stake but just singing along to music and making up songs. The court rejected defendant's testimony as entirely lacking in credibility. It found the anger in defendant's voice unmistakable and found that defendant's words sounded nothing like singing. When asked if he was singing in the recording submitted to the court, defendant acknowledged that he "was just yelling."

¶ 8. The court also rejected defendant's assertion that he was singing when he repeatedly told Mr. Stake that he "better get a gun, motherfucker" and told Mr. Stake and Ms. Swett to "go back to New Jersey," where both were from. Defendant also shouted at plaintiffs with a megaphone, including in June 2021. He told Ms. Swett to "go back to New Jersey if you don't like Vermont, you fucking bitch." He stood on his adjoining lot and called Ms. Swett a "dirty bitch" and a "cunt." Plaintiffs installed security cameras outside their homes because of their concerns about defendant. They were clearly afraid that his excessively angry behavior would escalate to violence. Mr. Stake, who resided primarily in New Jersey, came to Vermont less often because of defendant's harassment.

¶ 9. Based on these and other findings, the court granted plaintiffs' request to extend and modify the existing orders. It explained that under the statute, it had discretion to extend the orders "for such additional time as it deems necessary to protect the plaintiff[s]" and it could

modify the order on "a showing of a substantial change in circumstance." 12 V.S.A. § 5133(e). The court emphasized that, under § 5133(e), it did not need "to find that the defendant stalked . . . plaintiff[s] during the pendency of the order[s] to extend" them. The court concluded that a five-year extension of the order was "necessary to protect" plaintiffs and that plaintiffs had shown "a substantial change in circumstance" that warranted modification.

¶ 10. Because the parties stipulated to the initial stalking orders, the court began by describing defendant's pre-February 2021 behavior. See Forrett v. Stone, 2021 VT 17, ¶ 37, 214 Vt. 283, 256 A.3d 585 (per curiam) (recognizing that where parties stipulated to relief-from-abuse order, court could consider "evidence of the abuse that supported the initial temporary order" in deciding whether to extend order). As reflected above, the court found that defendant swore at plaintiffs, shouted about torturing them, and intentionally tried to scare Ms. Swett and Mr. Earle by shooting numerous rounds of ammunition in the direction of their home. The court considered defendant's use of a firearm as part of his threatening conduct to be a red flag of dangerousness.

¶ 11. After the stalking orders were issued, the court found it clear that, despite his denials, defendant knowingly violated the no-contact provisions of the existing orders by yelling at plaintiffs. That alone sufficed to extend the orders. Defendant also swore and used derogatory language toward Ms. Swett; he sat and intentionally stared at the Swett/Earle residence from the street and his neighboring lot. He purposely set off a game-call device with the intent of annoying plaintiffs. He made statements to Mr. Stake that could be considered "true threats." See Hinkson v. Stevens, 2020 VT 69, ¶ 45, 213 Vt. 32, 239 A.3d 212 (holding that term "threat" in stalking statute means "a communicated intent to inflict harm on a person or property" (quotation omitted)). To the extent that defendant claimed not to understand what conduct the order prohibited, the court emphasized that the existing order plainly prohibited any contact, which encompassed yelling at plaintiffs, screaming crude words knowingly directed at them, and telling one plaintiff to get a gun. The court rejected as laughably false defendant's claims that he was merely singing and not

4

directing his words at anyone. To avoid future issues, however, the court added a restriction on singing and playing music, discussed below. See infra, ¶¶ 40-46.

¶ 12. The court explained that, had this been a new stalking petition, it would need to determine if defendant's behaviors toward Ms. Swett and Mr. Earle independently met the definition of "threats," and constituted "stalking" as defined by statute. But the law did not require such proof to extend the orders. See 12 V.S.A. § 5133(e) ("It is not necessary for the court to find that the defendant stalked . . . the plaintiff during the pendency of the order to extend the terms of the order."). The question for the court was whether an extension of the orders was "necessary" to protect plaintiffs, id., and the court found the behavior at issue more than sufficient to meet this standard. It found that defendant showed a disturbing obsession with harassing and annoying plaintiffs and noted that this type of "fixation could be shown to imply more serious threats of harm." Hinkson, 2020 VT 69, ¶ 52. The court had no doubt that reasonable people in plaintiffs' shoes would feel that defendant presented a risk to their physical safety. The court concluded that a five-year extension was warranted given defendant's level of hostility.

¶ 13. Turning to plaintiffs' request for modification, the court found that defendant's repeated violations of the existing orders constituted a "substantial change in circumstance." 12 V.S.A. § 5133(e). It expanded the distance restriction to 300 feet but retained the exceptions for driving on the road, plowing snow, and walking dogs, as long as defendant did not stop or slow down to stare at or otherwise harass plaintiffs. It prohibited defendant from discharging a firearm on the vacant lot and limited his access to the lot to Monday through Friday from 9 a.m. to 5 p.m. To avoid future issues about the nature of defendant's conduct and what the no-contact requirement encompassed, the court added to its order that defendant could not sing or play music on the vacant lot or amplify his words or music from any location such that it could be heard at plaintiffs' properties. Defendant appeals.

5

## II. Arguments on Appeal

### A. Initial Order

¶ 14. Defendant first argues that, in considering whether to extend the order, the court needed to make findings to support the February 2021 stipulated order. He contends that the "course of conduct" requirement for the issuance of the initial no-stalking order was not satisfied. See 12 V.S.A. § 5131(6) (defining "stalk" as "to engage purposefully in a course of conduct directed at a specific person that the person engaging in the conduct knows or should know would cause a reasonable person to: (A) fear for his or her safety or the safety of a family member; or (B) suffer substantial emotional distress").

¶ 15. We reject this argument. The stalking statute provides that:

> Relief shall be granted for a fixed period, at the expiration of which time the court may extend any order, upon motion of the plaintiff, for such additional time as it deems necessary to protect the plaintiff or the plaintiff's children, or both. It is not necessary for the court to find that the defendant stalked or sexually assaulted the plaintiff during the pendency of the order to extend the terms of the order. The court may modify its order at any subsequent time upon motion by either party and a showing of a substantial change in circumstance.

Id. § 5133(e) (emphasis added).

¶ 16. Defendant stipulated to the initial orders and waived findings. As is evident from the plain language of the statute, the court was not required to make findings to support the initial orders in deciding whether to extend the orders. The question before the court was whether an extension of the order was "necessary to protect the plaintiff[s]." Id. The court appropriately heard evidence about defendant's pre-February 2021 conduct to put defendant's new behavior in context and it was not required to do more.

¶ 17. We did not suggest otherwise in Forrett, 2021 VT 17. In that case, the plaintiff obtained a relief-from-abuse (RFA) order against her former boyfriend. The parties waived findings and the plaintiff later moved to extend the order. At a hearing on her request, the trial

court ruled that any evidence related to the allegations underlying the initial RFA order would not be relevant or persuasive in deciding whether to grant an extension. We rejected this reasoning. We held that "the circumstances leading to the initial RFA order or [the] defendant's alleged history of violence" provided context for the incidents the plaintiff cited in support of her extension request and this information was relevant in deciding whether an extension of the RFA order was " 'necessary to protect the plaintiff . . . from abuse.' " Id. ¶¶ 8, 35 (quoting 15 V.S.A. § 1103(e)). We did not hold that the trial court was required to make specific findings to support the initial order. Instead, we remanded to the trial court to allow it to take evidence on the circumstances leading to the stipulated order so that it could place the testimony about the new acts in context.

¶ 18.     In the instant case, the court took evidence and made findings regarding the conduct that led plaintiffs to seek the initial order. The court had ample evidence from which to evaluate whether defendant's ongoing conduct, in the context of the circumstances leading to the initial order, was needed to protect plaintiffs. It did not need to make specific findings that defendant stalked plaintiffs to support the existing February 2021 stipulated orders.

### B. Extension of Orders

#### 1. Findings

¶ 19.     Turning to the decision to extend the orders, defendant challenges various findings made by the court. He argues that there is no evidence to support the court's findings that he "intentionally parks his truck on dark mornings and shines his headlights at the Swett/Earle home to disturb them" and that he sat in his car and stared at the Swett/Earle home. He raises a similar argument about his intent in playing the animal-distress call on the vacant lot. As to his statements to Mr. Stake and Ms. Swett, defendant appears to suggest that the court had to accept his testimony that he was singing rather than threatening or harassing plaintiffs, asserting that there was no testimony to directly contradict it. Essentially, he presents his view of the evidence and asks this Court to adopt it. Defendant also asks this Court to review a video of his encounter with Mr. Stake

7

and make findings other than those made by the trial court. He questions why findings were not made with respect to a different video.

¶ 20. As defendant recognizes, our "review of a trial court's findings . . . following a bench trial is limited." Kwon v. Edson, 2019 VT 59, ¶ 23, 210 Vt. 557, 217 A.3d 935. The "court's factual findings will not be disturbed on appeal unless clearly erroneous when viewed in the light most favorable to the prevailing party." Lofts Essex, LLC v. Strategis Floor & Decor Inc., 2019 VT 82, ¶ 17, 211 Vt. 204, 224 A.3d 116 (quotation omitted). "A finding will not be disturbed merely because it is contradicted by substantial evidence; rather, an appellant must show there is no credible evidence to support the finding." Id. (quotation omitted). We leave it to the trial court, as factfinder, to determine "the credibility of witnesses and . . . the persuasive effect of the evidence." Id. (citation omitted). We will uphold the trial court's conclusions "where they are reasonably drawn from the evidence presented." Id. (quotation omitted).

¶ 21. We find no error. The court was not obligated to make findings regarding the video referenced by defendant above nor was it required to accept defendant's version of events. It acted well within its discretion in rejecting defendant's testimony as not credible. The court's findings are amply supported by the evidence and they support the court's conclusion that an extension of the order was necessary to protect plaintiffs.

¶ 22. Ms. Swett testified that on multiple occasions, defendant stood on their shared property line and repetitively screamed expletives about her and Mr. Earle through a megaphone toward their home. He screamed through the megaphone after dark while plaintiffs were eating dinner. Defendant called Mr. Earle by name and screamed over and over, "you fucking pussy." Defendant repeatedly told Ms. Swett to "go back to New Jersey," which frightened her. Mr. Stake provided similar testimony, indicating that defendant sometimes screamed "go back to New Jersey" using a megaphone; defendant would sing and shout it as well.

8

¶ 23.    Plaintiff Stake testified that in April 2021, he was walking his dog when he encountered defendant working on the vacant lot.  Defendant engaged him and sang a derogatory song about Mr. Stake's wife.  Mr. Stake testified that defendant called his wife "a motherfucking ugly bitch," a "cunt," and a "smelly pussy."  Defendant said that Mr. Stake "must jerk off all the time, because you have a fat, ugly wife."  Defendant also told Mr. Stake multiple times that he had "better buy a gun, motherfucker."  Portions of this encounter were captured on a security video.[1] Mr. Stake testified that defendant said these things to him to threaten and harass him; he felt targeted by defendant and fearful for himself and his family.  He explained that these incidents were only "a small snapshot of a larger problem."

¶ 24.    Mr. Stake also described incidents where defendant would stand on his property and yell and scream obscenities and other things at him, which scared him.  He testified that defendant threatened him many times and he was frightened by defendant's sudden and escalating rage.  He described defendant as engaging in this type of behavior more often since February 2021. Mr. Stake had interacted with law enforcement at least a dozen or more times since the February 2021 order issued.  Mr. Stake recounted that defendant threatened him in January 2021 and then went to the vacant lot and shot off over 140 rounds of ammunition.   He also testified that in June 2021, after a vote on a municipal gun ordinance, defendant was yelling in his megaphone; Mr. Stake turned on a recording device and captured the sound of gunfire.

¶ 25.    Mr. Earle testified that he heard defendant's interaction with Mr. Stake during the April 2021 dog-walking incident.  Mr. Earle began recording the incident because defendant's anger appeared to be escalating during the encounter and he was afraid of what might happen.  He

_____

[1]  Our standard for reviewing the trial court's findings concerning the video is "the same as with other evidence presented in the case."  In re M.K., 2015 VT 8, ¶ 15 n.*, 198 Vt. 233, 114 A.3d 107.  "We make no appellate findings based on our viewing of the video but rather consider whether the [trial] court's findings are supported by the record and not clearly erroneous, and, if so, whether they, in turn, support the court's legal conclusion."  Id.  The evidence supports the court's findings regarding defendant's anger and escalating tone during the encounter.

9

described defendant as very angry, using profanity, and otherwise engaging in various outbursts. Mr. Earle also testified to the multi-hour game-call incident where the sound was played much louder than prior times defendant had done something similar. He testified to defendant parking in the vacant lot around 6 a.m., "blaring music from his truck, shining his headlights at [their] house, like he frequently [did], and bang[ing] on his metal storage container just to create a disturbance." He described an incident where defendant saw him walking his dog, defendant slowed down, and then parked "dead facing [the] windows of [their] house," and "sat there for at least ten minutes just staring at the house." Defendant left his headlights on while he sat there.

¶ 26. Mr. Earle further testified that defendant blared music on the lot and made a lot of noise on a regular basis, as often as every day. Defendant did not appear to be actively working on anything on the lot. He did not turn off the noise alarm on his excavator and it beeped consistently. Like Mr. Stake, Mr. Earle testified that he had interacted with law enforcement at least eight-to-ten times since the stalking order issued and that defendant's continued behavior to harass and intimidate made him fear for his safety. Mr. Earle stated that the behavior had been escalating for a year, there were more outbursts of angry shouting, and more intentional noise. Defendant appeared unable to control his anger, which was frightening.

¶ 27. The court credited plaintiffs' testimony about the purposeful nature of defendant's behavior and rejected defendant's claim to have been simply singing or otherwise engaged in innocuous activity.[2] We defer to the trial court's credibility assessments on appeal. The trial court's findings about defendant's behavior and his intentions are supported by the record and they support the court's conclusion that an extension of the order was necessary to protect plaintiffs.

---

[2] Defendant suggests that the court was biased because it noted that defendant did not testify that the songs he professed to be singing were on his playlist at the time of the incidents. The court's statement is consistent with the evidence, and it does not show bias. The observation was tangential in any event. The court found defendant's claim about singing to be laughably false for other reasons.

¶ 28. In reaching our conclusion, we emphasize, as discussed in greater detail below, that the court does not need to find additional acts of stalking to extend the order. It is true that a plaintiff might need to show "true threats" to establish "stalking" as defined by statute for purposes of an initial order. See Hinkson, 2020 VT 69, ¶ 44. But once a party has established their entitlement to relief—whether by stipulation or otherwise—"the court shall order the defendant to stay away from the plaintiff . . . and may make any other order it deems necessary to protect the plaintiff." 12 V.S.A. § 5133(d). Like an RFA order, a stalking order may prohibit "otherwise legitimate conduct" if necessary to protect plaintiffs. State v. Goyette, 166 Vt. 299, 302, 691 A.2d 1064, 1066 (1997). This may include "requir[ing] the defendant to refrain from interfering with the plaintiff's personal liberty" and "restrict[ing] the defendant's ability to contact the plaintiff or come within fixed distance of the plaintiff." Id. It may also include prohibiting a defendant from engaging in "annoying or bothersome conduct." State v. Waters, 2013 VT 109, ¶ 28, 195 Vt. 233, 87 A.3d 512. As with RFA orders, it can do so "not because such conduct is itself the target of the statute, but because in the context of domestic violence," or analogously stalking, "such conduct may 'mature into further incidents of abuse' " or stalking. Id. (quoting Benson v. Muscari, 172 Vt. 1, 4, 769 A.2d 1291, 1294 (2001) (alteration omitted)).

¶ 29. We held in Waters that "[a]n RFA order certainly can, and in many cases should, proscribe . . . conduct that is not unlawful in its own right or even necessarily threatening, but which in the context of a relationship characterized by domestic violence takes on a different significance." Id. ¶ 31. "[A] court is free to prohibit a defendant from having any contact with a petitioner, or to specifically restrict the mode, substance, and timing of any permitted contact." Id. We recognized that "[s]eemingly innocuous statements or conduct may take on very different meaning when understood against the backdrop of a history of violence or threats of violence." Id. ¶ 23. This applies equally in the stalking context.

## 2. Legal Standard

¶ 30. This leads us to defendant's argument that, to be granted an extension, plaintiffs must prove that they needed protection "against stalking." Citing Forrett, defendant contends that "the term 'protect' is defined to mean protection against stalking behavior." 2021 VT 17, ¶ 35 (stating that trial court does not have unlimited discretion to extend RFA order but must instead "have some basis for concluding that extending an RFA order is 'necessary to protect the plaintiff . . . from abuse.' " (quoting 15 V.S.A. § 1003(e))). According to defendant, there is insufficient evidence here to show that he "stalked" plaintiffs as defined in 12 V.S.A. § 5131(6). In support of this argument, defendant again presents his view of the evidence.

¶ 31. We reject the premise of this argument. Plaintiffs did not need to prove stalking as defined in 12 V.S.A. § 5131(6) to be entitled to an extension of the order. The statute specifically provides otherwise. See id. § 5133(e) ("It is not necessary for the court to find that the defendant stalked or sexually assaulted the plaintiff during the pendency of the order to extend the terms of the order."). We did not impose this type of requirement in Forrett, as defendant suggests. The language of the RFA statute provides that a court may extend an RFA order where "necessary to protect the plaintiff . . . from abuse." 15 V.S.A. § 1103(e). Like the stalking statute, "[a] plaintiff need not prove additional acts of abuse or violations during the term of an RFA order to secure an extension;" "[t]he Legislature has expressly rejected such a requirement." Forrett, 2021 VT 17, ¶ 36; 15 V.S.A. § 1103(e) ("It is not necessary for the court to find that abuse has occurred during the pendency of the order to extend the terms of the order.").

¶ 32. As discussed above, the concern in Forrett was that the trial court lacked evidence about the circumstances that led to the RFA order, and consequently, it lacked sufficient evidence to determine if the events testified to by the plaintiff sufficed to support an extension of the RFA order. We did not hold that plaintiff needed to prove she needed protection from new acts of "abuse" as that term is defined by statute. See 15 V.S.A. § 1101(1) (defining "abuse" in relevant

12

part as "[a]ttempting to cause or causing physical harm"; "[p]lacing another in fear of imminent serious physical harm"; "[s]talking"; or "[s]exual assault"). The post-order events that the plaintiff testified to in Forrett included the defendant driving "fast over a speed bump right in front of [her]" and on another occasion, "walk[ing] into a park where [she] was playing softball, [and] glaring at her." Id. ¶ 38. We held that this evidence might suffice "to support the court's conclusion that an extension of the order was necessary to protect [the] plaintiff from abuse" if taken "[i]n the context of evidence or findings relating to the abuse underlying the initial order." Id. "But in the absence of any such evidence or findings," we concluded that "the court lacked a sufficient basis for concluding that extending the RFA order was necessary to protect [the] plaintiff from abuse." Id. We remanded the case to allow the plaintiff to present additional evidence to place the acts she described at trial in context.

¶ 33. In the instant case, the trial court heard evidence and made findings about defendant's conduct leading up to the stipulated stalking order. It found that, notwithstanding this order, defendant continued to engage in similar aggressive, intimidating, harassing, and threatening behavior. It concluded that the behavior, which appeared to reflect an unhealthy obsession with plaintiffs, would cause a reasonable person to fear for their personal safety. The evidence supports the court's conclusion that an extension of the order was warranted.

### C. Firearm Use

¶ 34. Defendant next argues that the court could not prohibit him from discharging a firearm on the vacant lot as part of its stalking order. He argues that this limitation violates his right to "keep and bear arms" under the Second Amendment of the Federal Constitution. See U.S. Const. amend. II ("A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."); see also District of Columbia v. Heller, 554 U.S. 570, 592 (2008) (holding that Second Amendment's operative clause—"the right of the people to keep and bear Arms shall not be infringed"—"guarantee[s] the individual

13

right to possess and carry weapons in case of confrontation"). He cites N.Y. State Rifle & Pistol Ass'n v. Bruen, 142 S. Ct. 2111 (2022), in support of his argument. He suggests that the discharge provision in the stalking order is a "state restriction which prohibits a person from possessing a firearm" and that, under Bruen, the restriction cannot stand unless it is "consistent with the Nation's historical tradition." Id. at 2117. With little elaboration, defendant asserts that "Vermont has a long tradition of minimal regulation of the possession and use of any firearm." Defendant acknowledges that the Vermont Legislature can, and has, imposed restrictions on firearm possession, but contends that the trial court lacks authority in a civil-stalking case to restrict his ability to fire a gun on his property. He states that there is no evidence that the Town of Mendon has restricted firearm use within the town.[3]

¶ 35.     Defendant has not adequately briefed his claim that the court's order in this case falls within the rationale of Bruen and violates the Second Amendment. See State v. Jewett, 146 Vt. 221, 221, 500 A.2d 233, 234 (1985) (declining to address inadequately briefed constitutional argument). In Bruen, the U.S. Supreme Court adopted an approach to evaluate the constitutionality of laws that impact the Second Amendment's "right to keep and bear arms." It held that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," and "[t]o justify its regulation," "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." Bruen, 142 S. Ct. at 2126.

¶ 36.     The court did not bar defendant from possessing or carrying a firearm and defendant does not explain how the "plain text" of the Second Amendment covers the conduct referenced in the stalking order. Even assuming arguendo he could make this showing, defendant provides no meaningful analysis of why the court's restriction would be inconsistent with the "historical

---

[3]  We reject defendant's unexplained contention that the trial court somehow violated his "rights" under 22 V.S.A. § 2291 and § 2295. Those statutes relate to the power of municipalities to regulate firearms.

tradition of firearm regulation," id. See Heller, 554 U.S. at 626 (recognizing that "[l]ike most rights, the right secured by the Second Amendment is not unlimited," and government may, for example, lawfully prohibit those accused or convicted of crimes from possessing weapons); 18 U.S.C. § 922(g)(8) (prohibiting individual subject to civil protection order involving intimate partner from possessing or receiving firearm in interstate commerce); see also State v. Misch, 2021 VT 10, ¶ 45, 214 Vt. 309, 256 A.3d 519 (recognizing that "Vermont has had, and continues to have, numerous firearms-related restrictions" and that "the use of firearms has long been understood to be subject to regulation by the State" (citing statutes)); id. ¶ 49 (recognizing that "[g]iven the stark reality of gun violence, subject to the limitations of the Constitution, the Legislature acts within its authority in exercising its inherent power to impose such reasonable regulations and restraints as are essential to the preservation of the health, safety and welfare of the community" (citation omitted)).  Because defendant's constitutional argument is not adequately briefed, we do not address it on the merits.

¶ 37.  In a stalking case, the trial court is authorized by statute to order a defendant to "stay away" from a plaintiff and to "make any other order it deems necessary to protect the plaintiff." 12 V.S.A. §5133(d).  We held in Benson, 172 Vt. at 9, 769 A.2d at 1298, an RFA case, that "the general authorization for the court to make orders it deems necessary to protect [a] plaintiff . . . [is] sufficiently broad to allow the court to prohibit [the] defendant from possessing firearms."  (Emphasis added.)  We noted that "many state legislatures, and the United States Congress, have concluded that restricting an abuser's access to firearms will reduce the threat of further abuse, or the injury that might result from further abuse." Id. at 8, 769 A.2d at 1297-98.

¶ 38.  Defendant does not address this case or explain why we should reach a different conclusion in the face of similar statutory language.  He does not explain why, if a court has discretion to prohibit the possession of firearms in a protection order, it cannot take the lesser step of restricting where a defendant can discharge a firearm if necessary to protect a plaintiff.  As in

Benson, we conclude that the court's authority to "make any other order it deems necessary to protect the plaintiff," 12 V.S.A. § 5133(d), includes the power to impose a firearm-discharge restriction.

¶ 39.    The court's decision to impose this restriction here is supported by the evidence. Indeed, defendant stipulated to this restriction in the initial order.  Defendant intentionally fired over 100 rounds of ammunition on the vacant lot following an interaction with Mr. Stake; he purposefully fired in the direction of the Swett/Earle home to scare them.  The court considered this a red flag of dangerousness.  Defendant continued to threaten Mr. Stake by telling him that he'd "better get a gun, motherfucker."  Notwithstanding the issuance of stalking orders, defendant continued to exhibit an obsession with harassing and threatening plaintiffs, he had bursts of anger and aggression toward them, and gunfire was recorded during one encounter.  Plaintiffs described defendant's behavior as escalating in frequency and intensity.  They feared his anger would lead to violence and they feared for their physical safety.  The court reasonably concluded, based on the evidence, that to protect plaintiffs, defendant should be prevented from discharging a firearm on the lot that adjoined the Swett/Earle home, particularly given that he had previously fired toward their house to scare them.

### D.  Restriction on Singing and Music Playing

¶ 40.    Defendant next argues that the court exceeded its authority by imposing limits on his ability to sing and play music on the vacant lot or amplify his words or music from any location such that it could be heard at plaintiffs' properties.  He contends that this restriction violates his First Amendment rights under the federal constitution and similar rights under Chapter I, Article 13 of the Vermont Constitution.  Assuming the court had authority to impose this restriction, defendant argues that his singing did not constitute stalking and thus could not be restricted.  He deems it "inconceivable" that singing on the vacant lot could violate a stalking order.

16

¶ 41.    We reject this argument.  The court did not need to find that the singing constituted stalking, for the reasons previously discussed.  The court's restriction is grounded in the evidence presented at trial.  In fact, it directly responded to defendant's post-hearing assertion that the existing order was not sufficiently clear as to what conduct was prohibited.  (Defendant argued that "[t]here simply is no clear line that provides [him] notice of what conduct will ultimately result in criminal consequence under the Stalking Order.")

¶ 42.    Defendant maintained below that "[h]e was just happily singing to himself, making up his own lyrics to songs while listening to music" and "[h]e lacked the subjective intent to contact Plaintiffs in violation of the Stalking Order."  He argued that when he "works and develops his property and conducts activities in the ordinary course, he sings and talks out loud to himself" and that plaintiffs erroneously "interpreted all of this conduct to be targeted at them, when it was simply a product of the incidental nearness the parties have as neighbors with abutting properties."  He suggested that these issues would continue to arise based solely on proximity as long as the parties were neighbors.

¶ 43.    The court determined that defendant was not singing but targeting plaintiffs with threats and harassment.  "Defendant has no First Amendment right to inflict unwanted and harassing contact on another person."  State v. Mott, 166 Vt. 188, 194, 692 A.2d 360, 365 (1997) (citing cases so holding), overruled on other grounds by Hinkson, 2020 VT 69, ¶ 22.  For this reason, we have rejected the argument that a no-contact provision in an RFA order violates a defendant's First Amendment rights or is "overbroad because it involves communication."  Mott, 166 Vt. at 194, 692 A.2d at 365.  The court here found that defendant's behavior, including his "singing," constituted contact and caused plaintiffs fear.  It was important to make clear to defendant that what he characterized as "singing" was nonetheless prohibited.  Thus, in response to defendant's actions and arguments, the court drew a bright line on acceptable conduct on the vacant lot and elsewhere.  It acted within its discretion in doing so.  See State v. Goyette, 166 Vt.

17

299, 302, 691 A.2d 1064, 1066 (1997) (recognizing that order may "prohibit otherwise legitimate conduct to prevent future abuse").

¶ 44. We find these limitations analogous to "stay away" provisions, the benefits of which we discussed in Benson. The defendant in Benson was subject to a 1000-foot buffer zone and he argued that this restriction "denie[d] him due process of law, and violate[d] his right to live in the community, to associate with others, and to travel." 172 Vt. at 3, 769 A.2d at 1294. The defendant argued "that he might inadvertently violate the 1000-foot limit." Id.

¶ 45. We rejected these arguments. As we explained:

It is well-documented that 'stay-away' provisions, including buffer zones of protection, implement important policy objectives underlying abuse prevention orders. They are specific and definite, minimizing interpretation issues. They prohibit what otherwise may be viewed as inoffensive contact before it matures into further incidents of abuse. And they provide the victim a measure of emotional security from fear of further contact with the abuser.

Id. at 3-4, 769 A.2d at 1294 (citations omitted). We concluded "that these important policy goals [were] sufficient to justify the incidental restrictions they may impose on [the] defendant's freedom of travel and association." Id.

¶ 46. These policy goals are equally at play here. Plaintiffs testified to the fear caused by defendant's ongoing contact with them in the form of harassing and threatening songs. Defendant made crude and threatening comments to plaintiff under the guise of "singing." The court reasonably concluded that a specific and definite restriction was required to prevent this type of behavior from continuing and to make it clear to defendant that this type of behavior would constitute a violation of the order. The clear prohibition "minimize[es] interpretation issues" and provides plaintiffs with "a measure of emotional security." Id. The court did not err in including this restriction in its order.

E. "Taking" Argument

¶ 47. Finally, defendant asserts that the court's limitation on his use of the vacant lot to weekdays from 9 a.m. to 5 p.m. violates his constitutional right to use his property. He asserts that this limitation constitutes a "taking" of his property. Defendant cites the Fifth Amendment to the U.S. Constitution, which provides in relevant part that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." He cites similar provisions in the Vermont Constitution. See, e.g., Vt. Const. Chapter I, art. 1 & art. 2. He contends that due process includes "a defendant's rights to a decision consistent with [the] law," and asserts that the government can "take away" his property rights "only in the context of eminent domain."

¶ 48. We reject this argument because defendant fails to show that his property was taken by the government "for public use," U.S. Const., amend. V, or that this type of limited restriction was a "taking." See Lorman v. City of Rutland, 2018 VT 64, ¶ 36, 207 Vt. 598, 620, 193 A.3d 1174 ("When the intrusion is limited and transient in nature and occurs for legitimate governmental reasons, it does not amount to a taking." (quotation omitted)). Defendant identifies no reason why a different result would obtain under the Vermont Constitution. Courts have the authority to remove individuals subject to an RFA from their own home to protect others. See 15 V.S.A. § 1103(c)(2)(B) (stating that RFA order may include "order that the defendant immediately vacate the household and that the plaintiff be awarded sole possession of a residence"). We conclude that the court acted within its authority here in taking the lesser step of restricting defendant's ability to use a vacant lot that directly adjoins the Swett/Earle property.

¶ 49. The court's decision is grounded in its findings. Defendant was engaging in activities on the lot to harass and contact plaintiffs in violation of existing stalking orders, including parking with his lights shining in the Swett/Earle home at 6:00 a.m., playing an animal-distress sound for hours late at night, screaming expletives through a megaphone at plaintiffs while they

19

ate dinner, and screaming crude and personal insults at Mr. Stake from the lot as he walked his dog on the road. Defendant continually made loud noise on the lot—leaving the alarm on his excavator to beep as he used the vehicle and banging on a metal drum—as often as every day. He had been working on the vacant lot for over a year. All plaintiffs expressed fear of defendant; Mr. Stake was visiting Vermont less because of defendant's behavior. The court acted within its discretion in determining that limiting defendant's presence on the lot to business hours, Monday through Friday, was necessary to protect plaintiffs. The limitation reduces defendant's ability to use the lot as a place from which to harass and contact plaintiffs and provides plaintiffs a measure of safety and security during these periods and an ability to enjoy their own property. It reduces interactions based on "proximity," with the hopeful goal of preventing any escalation to violence.

¶ 50.    Thus, for the reasons set forth above, we find no error in the court's decision to extend and modify the stalking orders.[4]

Affirmed.

FOR THE COURT:

_____

Associate Justice

---

[4] During the pendency of this appeal, defendant moved to strike portions of plaintiffs' brief. He argued that plaintiffs referenced an exhibit that was not admitted at trial and made an assertion concerning a municipal gun ordinance that was unsupported by the record. Plaintiffs opposed the motion. The record shows that plaintiffs cited to the trial court's February 2021 order and not to an unadmitted exhibit and this portion of defendant's request is thus denied. We have not considered the objected-to sentence in plaintiffs' brief in reaching our conclusion in this case and we deny as moot defendant's request to strike this language. Both parties seek costs and fees associated with the motion to strike. These requests are governed by Vermont Rule of Appellate Procedure 39 and we do not address them here.